PATRICIA RIVET MURRAY, Judge.
 

 I r This is a workers’ compensation case. The employer, the New Orleans Police Department (“NOPD”), appeals two judgments of the workers’ compensation judge (“WCJ”) in favor of the claimant, Cathy Reinhardt. The judgments denied the NOPD’s exception of prescription as to Ms. Reinhardt’s indemnity benefits claim and awarded her temporary total disability benefits (“TTD”). For the reasons that follow, we affirm the WCJ’s findings that the indemnity benefits claim is not prescribed and that Ms. Reinhardt sustained a work-related disability. However, due to the lack of evidence regarding Ms. Reinhardt’s inability to work at any job, we reverse the WCJ’s award of TTD and remand for a determination of her entitlement to supplemental earnings benefits (“SEB”).
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 On September 3, 2004, Ms. Reinhardt, while in the course and scope of her employment as a NOPD homicide detective, was in a motor vehicle accident. The driver of the other vehicle ran a stop sign and struck the driver’s side of the vehicle |aMs. Reinhardt was driving. On the day of the accident, Ms. Reinhardt was treated at the emergency room and released. Thereafter, Ms. Reinhardt treated with her choice of physicians. She continued to work full time until January 2006. From January 2006 to January 2007, she submitted documentation — NOPD Form 50 (Physician’s Examination Certifications)(“Form 50”)— to the Administrative Duties Division (“ADD”)
 
 [1]
 
 indicating her inability to work.
 
 [2]
 
 To avoid being terminated by the NOPD, Ms. Reinhardt resigned in January 2007.
 

 Near the end of the tort prescriptive period, Ms. Reinhardt filed suit against the third party tortfeasor. The NOPD intervened in the tort suit to assert a workers’ compensation lien for the medical expenses it had paid on Ms. Reinhardt’s behalf. As a result of the settlement of the tort suit the NOPD was paid $9,314.13.
 

 On March 27, 2006, Ms. Reinhardt, who was still employed by the NOPD, filed a Disputed Claim for Compensation (LDOL-WC-1008) seeking to recover wage benefits, authorization of recommended medical treatment, and attorney’s fees and penalties. The NOPD answered asserting as an affirmative defense, among other things, that Ms. Reinhardt was not disabled as a result of a work-related accident.
 

 This matter was tried over a period of three separate days. Before trial, the parties stipulated to the following:
 

 |31. That on September 3, 2004, Ms. Reinhardt sustained a work-related ac
 
 *233
 
 cident within the course and scope of her employment with NOPD.
 

 2. That Ms. Reinhardt has been employed with the NOPD since June 2, 1991.
 

 3. Ms. Reinhardt’s NOPD annual salary was $45,873.61 for 2004, which was in addition to her State Supplemental Pay and Private Detail Pay.
 

 4. Any TTD benefits which are due would be at the maximum compensation rate at the time of the injury which is $438.00.
 

 On September 23, 2008, the first day of trial, Ms. Reinhardt presented her case, which included calling two witnesses: Wade Schindler, Ph. D.; and herself. Dr. Schindler, who was qualified as an expert in police officer qualifications, testified that given the limitations Ms. Reinhardt’s doctors have imposed on her she was unable to perform the job of a police officer.
 

 Ms. Reinhardt, who was forty-three years old at the time of trial, testified that although before the September 2004 accident she had some injuries, she had no significant problems from October 2001 until September 2004. During that three year period before the accident, she worked full time as a homicide detective. Ms. Reinhardt testified that in the September 2004 accident she was bounced around, hit the steering wheel, cracked her head on the window, and was jerked out of her seat and then jerked back. Although Ms. Reinhardt did not lose consciousness, she immediately developed severe headaches as well as pain in her arm, hand, neck, hip, and lower back. On the day of the accident she was treated in the emergency room and released with instructions to see either the NOPD doctor, Dr. McSwain, or her own doctor.
 

 | .¡Four days after the accident, Ms. Reinhardt began treatment with Dr. Stewart Altman. Dr. Altman recommended she see a neurologist, but the NOPD failed to authorize her to see a neurologist until during the trial. Dr. Altman also recommended that she have an MRI, which was done in 2004. According to Ms. Reinhardt, the 2004 MRI revealed that she had problems with the discs in her neck and lower back that were causing her problems.
 

 From September 2004 through March 2005, Dr. Altman continued to treat Ms. Reinhardt. During this time, he continually imposed light duty restrictions on her, which she defined to mean not lifting heavy things, not encountering any physical fights that would injure her further, and not using her weapon. During this time, she described the problems she had performing her job as a police officer to be sitting and standing and her inability to do physical things like handcuffing, using her weapon, writing, or using the computer. During this time, she estimated that she missed about two months of work for which she was not paid any workers’ compensation disability benefits; rather, the NOPD used her acquired sick days and annual leave time to pay her. Although she returned to work, she testified that she had difficulty performing her job and that she only worked what was called “injured-on-duty.”
 

 Beginning in January 2005, Ms. Reinhardt began treating with Dr. Jase, a chronic pain specialist. Ms. Reinhardt testified that for about five months in 2005 she had no motion at all in her right arm and leg, and she thought she was having a stroke. For this reason, she was hospitalized in the summer of 2005; her discharge [.^diagnosis was transient paresthesia. Also in the summer of 2005, Dr. Jase referred her to Dr. Charles April for a deeper type of injection that he did not perform. Due to Hurricane Katrina, which stuck the area on August 29, 2005,
 
 *234
 
 Ms. Reinhardt did not see Dr. April until February 2006. She testified that she worked, albeit in pain, through Hurricane Katrina and its aftermath.
 

 During 2006, Ms. Reinhardt was seen by Dr. April and received two injections. Because the injections did not provide significant relief, Dr. Jase also referred her to a neurosurgeon, Dr. Jajeeb Thomas, for possible surgical intervention. Ms. Reinhardt was seen by Dr. Thomas, and he, in turn, referred her to a hand specialist, Dr. Eric George, for evaluation of her severe carpal tunnel syndrome.
 
 [3]
 

 At trial, Ms. Reinhardt testified that she had not worked since January 16, 2006, with the exception that from January to July 2007 (for a seven month period) she owned and operated a coffee shop in Hammond. She testified that her coffee shop was destroyed by a fire (apparently arson) and that she did not have the money to reopen it. She also testified that she had difficulties performing the | (¡physical tasks of running the business. As noted elsewhere, in January 2007, Ms. Reinhardt resigned from the NOPD to avoid being terminated.
 
 [4]
 

 On the second day of trial, November 19, 2008, the NOPD put on its case, which included calling five witnesses: (i) NOPD Lieutenant Grafton Salvant, (ii) Kimberly Brown, (iii) Kevin Pierre, (iv) Dr. Jase, and (v) Dr. Brobson Lutz.
 

 Lieutenant Salvant testified that for a brief period spanning 2006 to 2007 he was assigned as sergeant of the ADD. In the winter of 2006, Lieutenant Salvant reviewed Ms. Reinhardt’s file and noticed that it lacked the required documentation to justify her continued absences — completed Form 50s. At that time she had been absent for several months. He contacted Ms. Reinhardt and advised her that she needed to provide up-to-date documentation.
 

 On January 19, 2007, Ms. Reinhardt provided Lieutenant Salvant with twenty-five Form 50s with attachments detailing her absence. The Form 50s were dated from January 15, 2006, through January 25, 2007. The Form 50s were from Dr. Jase, and the forms indicated that Ms. Reinhardt was unable to return to work as a police officer in any capacity at the time. The dates on which the forms were signed corresponded roughly to the dates on which Ms. Reinhardt had office visits with Dr. Jase. Ms. Reinhardt also submitted a letter from Dr. Jase to the NOPD dated January 12, 2007, which stated “[a]t this
 
 *235
 
 time, Ms. Reinhardt is unable to return to work in any capacity regarding her ability to use her firearm and to defend herself.”
 

 |70n January 23, 2007, Lieutenant Sal-vant responded by sending Ms. Reinhardt an interoffice memorandum informing her that most of the Form 50s were incomplete and requesting that she provide completed forms as soon as possible. He further informed her that given her doctor’s assessment that she will never return to full duty, the NOPD would be invoking Rule 9 of the City Civil Service Commission, which provides, among other things, that the appointing authority may take corrective action, including removal from service, when a civil service employee is unable to perform the duties of her position in a satisfactory fashion.
 

 On January 26, 2007, Ms. Reinhardt responded by letter explaining her position regarding the Form 50s that she provided and indicating that she had opted to voluntarily resign.
 
 [5]
 
 She also noted that she had filed an application for disability retirement. Although Ms. Reinhardt maintained that she timely had furnished each of the Form 50s to Lieutenant Salvant’s predecessor in office and that they were simply missing from the file, Lieutenant Salvant testified that he did not believe her. He stated that it was strange that one employee’s form for a whole year were missing, but every one else’s forms were up-to-date.
 

 Kimberly Brown, a NOPD police technician 3 — payroll, testified that she received Ms. Reinhardt’s termination package in January 2007. According to Ms. Brown, the information on the termination form, including the assertion that the treason for termination was “sustained an injury while working on the job,” was provided by Ms. Reinhardt.
 

 Kevin Pierre, a Cannon Cochran Management Services (“CCMSI”)
 
 [6]
 
 claims supervisor, testified that he had worked on Ms. Reinhardt’s claim since it was first filed in September 2004. On the date of the accident, the NOPD prepared an initial report of injury in which the accident was reported as a “medical only” workers’ compensation claim. Ms. Reinhardt’s claim therefore was originally categorized as a “medical only claim” with a possible third party subrogation claim. Mr. Pierce testified that Ms. Reinhardt filed a timely tort suit against the third party tortfeasor in which the NOPD intervened and recovered medical expenses it had paid on her behalf.
 

 By letter dated September 10, 2004, CCMSI notified Ms. Reinhardt that it was handling her compensation claim and that if she was claiming any lost time from work for this injury she would have to provide it with documentation of medical certification of injury before any disability benefits would be considered. Mr. Pierce acknowledged that the NOPD had never disputed Dr. Jase’s treatment of Ms. Reinhardt and that it was still paying her medical expenses.
 

 Dr. Jase testified that his areas of practice are general medicine, physical medicine, and rehabilitation; he is not board certified in any particular specialty. From January 2005 to February 2008, Dr. Jase provided primarily pain management care
 
 *236
 
 to Ms. Reinhardt. Dr. Jase acknowledged at trial that at the |9request of the Louisiana State Board of Medical Examiners he voluntarily restricted his medical license and that as of 2008 he could not provide pain management care.
 
 [7]
 
 In February 2008, Dr. Jase issued a notification to his patients that he was no longer able to provide “Chronic Pain Management” services. Since then, Dr. Jase has not treated Ms. Reinhardt.
 

 Dr. Brobson Lutz, who was qualified as an expert in internal medicine and infectious disease, testified that on the NOPD’s behalf he performed a second medical opinion (“SMO”) evaluation of Ms. Reinhardt. The SMO was performed on November 7, 2008, which was during the pendency of the trial.
 
 [8]
 
 Based on his evaluation, Dr. Lutz issued an original report, which the WCJ allowed into evidence, and a supplemental report, which the WCJ excluded from evidence.
 

 As noted, the trial began on September 23, 2008, and concluded on November 19, 2008. On January 27, 2009, the WCJ heard and denied the NOPD’s exception of prescription, which was raised during the trial based on Ms. Reinhardt’s testimony. Thereafter, post trial briefs were filed, and the matter taken under advisement. On March 3, 2009, the WCJ rendered judgment finding as follows:
 

 • Ms. Reinhardt carried her burden of proving that she suffered a work-related accident within the course and scope of employment with the NOPD on September 3, 2004;
 

 • The NOPD is ordered to pay Ms. Reinhardt TTD at the applicable maximum workers’ compensation rate of $438.00 per week for any |]0and all unpaid absences due to this workers’ compensation injury from September 3, 2004 through December 31, 2005. These dates were either paid as sick leave or stated (on defendant’s reports) that workers’ compensation benefits were paid but were not actually paid by the third party administrator for defendant; and
 

 • The NOPD is order to pay Ms. Reinhardt the applicable maximum TTD rate of $438.00 per week from January 1, 2006 and continuing until modified by the court.
 

 • The NOPD is assessed all costs including the expert fee of Dr. Schindler of $1,400. The NOPD is assessed all unpaid medical bills and expenses to date of trial plus legal interest from the date received, and legal interest on all unpaid workers’ compensation indemnity benefits from the date originally due until paid.
 

 The WCJ further found that the NOPD did reasonably controvert this claim and thus denied Ms. Reinhardt’s request for penalties and attorney’s fees.
 

 DISCUSSION
 

 In a workers’ compensation case, the appropriate standard of review applied to the WCJ’s factual findings is the manifest error-clearly wrong standard.
 
 Dean v. Southmark Constr.,
 
 03-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117. “When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings [ (sic) ]; for only the factfinder
 
 *237
 
 can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). Errors of law are reviewed
 
 de novo. Balseiro v. Castaneda-Zuniga,
 
 04-2038, p. 6 (La.App. 4 Cir. 8/17/05), 916 So.2d 1149, 1153.
 

 On appeal, the NOPD contends the WCJ erred in three respects: (i) finding Ms. Reinhardt’s claim for disability indemnity benefits had not prescribed, (ii) | n excluding Dr. Lutz’s supplemental report and his testimony stemming from that report, and (iii) finding that Ms. Reinhardt suffered from a disability as a direct result of the September 3, 2004, work-related accident and that disability benefits (TTD) are due. We separately address each of these contentions.
 
 [9]
 

 (i) prescription
 

 The NOPD contends that the WCJ erred in denying its exception of prescription to Ms. Reinhardt’s claim for indemnity benefits. La. R.S. 23:1209(A) sets forth the prescriptive period governing workers’ compensation claims. “[T]he statute provides that claims for disability benefits are barred unless filed (1) within one year from the date of the accident; (2) one or three years from the date of the last payment of compensation benefits, depending on the type of benefits paid; and (3) one year from the time the injury develops if not immediately manifest, but, in any event, no more than two years after the accident.”
 
 Muhammad v. New Orleans Police Dep’t,
 
 02-0306, p. 5 (La.App. 4 Cir. 6/26/02), 822 So.2d 183, 186 (citing
 
 Peeler v. Georgia-Pacific Corp.,
 
 96-1423, p. 3 (La.App. 1 Cir. 6/20/97), 696 So.2d 1064, 1066). The jurisprudence has liberally construed the time limits for institution of a claim for benefits.
 
 Scott v. Walmart Stores, Inc.,
 
 03-0104, p. 6 (La.App. 4 Cir. 7/2/03), 851 So.2d 1210, 1213-14 (citing 14 H. Alston Johnson,
 
 Louisiana Civil Law Treatise: Workers’ Compensation Law and Practice
 
 § 384 (3d ed.1994)). Prescription statutes, including La. R.S. 23:1209(A), are construed in |12favor of maintaining rather than barring actions.
 
 Taylor v. Liberty Mut. Ins. Co.,
 
 579 So.2d 443, 446 (La.1991).
 

 The NOPD contends that Ms. Reinhardt’s own trial testimony revealed that she was aware and believed that she suffered an injury that significantly limited her ability to work as a police officer as early as September 2004 and that she did not receive any workers’ compensation indemnity benefits. The NOPD thus contends that the applicable prescriptive period is one year from the date of the accident. Given that Ms. Reinhardt delayed filing a disputed claim until March 27, 2006, the NOPD contends that her claim for indemnity benefits was prescribed on its face. Ms. Reinhardt counters that the WCJ correctly denied the exception because she had a developing injury, she was paid unearned wages in lieu of workers’ compensation, and the NOPD lulled her into a false sense of security. Although not raised by the parties, we find prescription of Ms. Reinhardt’s workers’ compensation claim was interrupted by her timely filing of suit against the third party tortfeasor.
 

 The jurisprudence has recognized that a claimant’s timely filing suit against a third-party tortfeasor interrupts prescription as to the claimant’s workers’ compen
 
 *238
 
 sation claim against his employer arising out of that same accident.
 
 See Gatlin v. Cox Communications, Inc.,
 
 02-32 (La.App. 5 Cir. 4/30/02), 818 So.2d 801, 802;
 
 Bradley v. Mike Rougee Corp.,
 
 95-967, p. 3 (La.App. 5 Cir. 6/25/96), 676 So.2d 1111, 1113 (holding that the rule in
 
 Williams v. Sewerage & Water Bd. of New Orleans,
 
 611 So.2d 1383, 1390 (La.1993), operated to interrupt | ^prescription of the workers’ compensation claim when the tort suit was filed before that claim);
 
 Wilson v. City of Shreveport,
 
 28,846 (La.App. 2 Cir. 11/1/96), 682 So.2d 882;
 
 see also Muhammad, supra
 
 (citing
 
 Wilson, supra,
 
 but finding it factually inapposite). This line of jurisprudence is an extension of the Louisiana Supreme Court’s holding in
 
 Williams, supra,
 
 that a timely filed suit against the employer for workers’ compensation interrupts prescription as to the subsequent claim against the third party tortfeasor for damages arising out of the same accident.
 
 Williams,
 
 611 So.2d at 1390. The rationale of the
 
 Williams
 
 case is that an employer’s obligation to pay workers’ compensation benefits and a third party tortfeasor’s liability for damages arising out of the same accident is solidary. This line of jurisprudence recognizes that the reverse situation is likewise true — a timely filed suit against the third party tortfeasor for damages interrupts prescription as to the subsequent claim against the employer for workers’ compensation benefits.
 

 In this case, a copy of the tort suit Ms. Reinhardt filed is not contained in the record on appeal. Nonetheless, the parties acknowledge that Ms. Reinhardt timely filed suit against the third party tort-feasor. As noted elsewhere, the NOPD intervened in that suit. Given the parties’ acknowledgment of the timely filing of the tort claim, this court “takes judicial cognizance of the filing of that lawsuit and deems it timely filed.”
 
 Wilson,
 
 28,846 at p. 8, 682 So.2d at 886 (citing La. C.E. art. 201(B)(2) and La. C.E. art. 202). We also note that the CCMSI’s claim notes, which are in the record, reflect that the prescription period for the tort suit fell directly after Hurricane Katrina (prescription ran on September 3, 2006, and |HHurricane Katrina struck on August 29, 2005) and that Ms. Reinhardt’s tort suit was not filed until the end of the prescriptive period.
 

 Ms. Reinhardt’s timely filed tort suit interrupted prescription on her claim for workers’ compensation indemnity benefits. When prescription is interrupted, the time that has elapsed is not counted, and “[prescription commences to run anew from the last day of interruption.” La. C.C. art. 3466. “An interruption of prescription resulting from the filing of a suit ... within the prescriptive period continues as long as the suit is pending.” La. C.C. art. 3463. The result of Ms. Reinhardt’s timely filing of a tort suit at some point after Hurricane Katrina' — after August 29, 2005 — was that she acquired at least another year from the date she filed that suit to file her claim against the NOPD for workers’ compensation indemnity benefits. Her claim filed on March 27, 2006, was therefore timely. For this reason, we find the WCJ did not err in denying the NOPD’s prescription exception.
 

 (ii) evidentiary issue
 

 The NOPD next contends that the WCJ erred in excluding Dr. Lutz’s supplemental report dated November 18, 2008, and his testimony related to that report. In his supplemental report, Dr. Lutz stated that he had received on that date Ms. Reinhardt’s urine toxicology results from the testing that was done on the date he conducted the SMO, November 7, 2009. The laboratory report results indicated that “her urine tested positive for benzo-
 
 *239
 
 diazepines, oxazepam, opiates, codeine, and morphine.” The report further indicated that “[t]hese results conflict with what 11fishe told me on the day the urine was collected and provide additional support to the diagnosis of malingering.” (The conflict was that Ms. Reinhardt told Dr. Lutz that she had not taken any prescription pain medication for a few months before the SMO exam.) The WCJ, apparently accepting Ms. Reinhardt’s argument that there was not a proper certification for the supplemental report, ruled that it was inadmissible. The WCJ nonetheless allowed the NOPD to proffer both the supplemental report and Dr. Lutz’s related testimony.
 

 The NOPD argues that the WCJ erred in excluding the report. The NOPD points out that in workers’ compensation cases the WCJ has the freedom to admit documents that do not necessarily comport with the strict interpretation of the rules of evidence.
 
 See
 
 La. R.S. 23:1317(A)(stat-ing that the WCJ shall not be bound by “the technical rules of evidence.”) The NOPD contends that the WCJ erred in refusing to entertain a re-urging of this issue after the report and related testimony were proffered. The NOPD contends the WCJ should have reconsidered whether the report was otherwise reliable given (i) Dr. Lutz’s experience with the particular lab and its procedures, (ii) his routine use of these types of urine tests in treating patients, and (iii) his use of that lab for thirty years without any prior problems. The NOPD notes that the purpose of Dr. Lutz’s toxicology screen was not to present evidence of intoxication or to establish an affirmative defense; rather, the screen was part of his routine practice in formulating a diagnosis of a patient. The NOPD thus argues that the WCJ should have allowed the report and the related | ir,testimony on the issue into evidence. The NOPD also argues that the exclusion of the evidence prejudiced its ability to counter Dr. Jase’s testimony.
 

 Ms. Reinhardt counters that the WCJ did not err in excluding the supplemental report given that she timely objected to the report being introduced and given that she was prejudiced by her inability to question either the reliability or the substance of the lab findings included in the uncertified lab report. She also points out that the requirements of La. R.S. 23:1122 for introducing medical reports were not met.
 
 [10]
 

 “The decision to admit evidence into the record rests within the sound discretion of the workers’ compensation judge and will not be reversed in the absence of manifest error.”
 
 Central Lumber Co. v. Duhon,
 
 03-620, pp. 2-3 (La.App. 3 Cir. 11/12/03), 860 So.2d 591, 593 (citing
 
 Jones v. Trendsetter Prod. Co.,
 
 97-299, p. 11 (La.App. 3 Cir. 2/25/98), 707 So.2d 1341,
 
 *240
 
 1346). Based on the circumstances in this case, we cannot conclude that the WCJ erred in disallowing the proffered evidence. Regardless, the NOPD acknowledged that Dr. Lutz’s supplemental report did not alter the substance or the opinion expressed in his initial report dated November 17, 2008, which was allowed into evidence.
 

 h
 
 i(iii) causation and disability indemnity benefits
 

 The NOPD contends that the WCJ’s finding that Ms. Reinhardt suffered from a disability as a direct result of the September 3, 2004 work-related accident is not supported by the record. The NOPD also contends that Ms. Reinhardt failed to establish her entitlement to disability indemnity benefits under any standard. Subsumed in that argument is a contention that the WCJ’s award of TTD was improper. For the reasons that follow, we find that the record supports the WCJ’s finding of a work-related disability, but does not support the award of TTD.
 

 An injured employee is entitled to compensation benefits if she suffers a personal injury by an accident arising out of and in the course of employment. LSA-R.S. 23:1031. Pursuant to the statutory scheme, the injured employee bears the initial burden of establishing the causal connection between the disability and the employment accident by a preponderance of the evidence.
 
 Quinones v. U.S. Fidelity & Guar. Co.,
 
 93-1648 (La.1/14/94), 630 So.2d 1303, 1306-07. The chain of causation required by the statutory scheme is that the employment causes the accident, the accident causes the injury, and the injury causes the disability.
 
 Guillory v. U.S. Fidelity & Guar. Ins. Co.,
 
 420 So.2d 119, 122 (La.1982). An employee’s preexisting condition does not disqualify his claim if the workrelated injury either aggravated or combined with the infirmity to produce the disability for which compensation is claimed.
 
 Doucet v. Baker Hughes Prod. Tools,
 
 93-3087, p. 3 (La.3/11/94), 635 So.2d 166, 167. “Although procedural rules are construed liberally in favor of woi'kmen’s compensation claimants, the burden of 11sproof, by a preponderance of the evidence, is not relaxed.”
 
 Prim v. City of Shreveport,
 
 297 So.2d 421, 422 (La.1974). Disability can be proven by medical and lay testimony.
 
 Isaac v. Lathan,
 
 01-2639, p. 13 (La.App. 1 Cir. 11/8/02), 836 So.2d 191, 199. “[T]he testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability.”
 
 Prim, supra.
 

 In this case, the existence of a work-related accident was stipulated. The parties, however, dispute whether that accident caused Ms. Reinhardt any injuries that have resulted in a disability. Ms. Reinhardt testified that immediately after the accident she developed severe headaches as well as pain in her arm, hand, neck, hip, and lower back. On the day of the accident she was treated in the emergency room and was diagnosed with lumbar strain, trapezius strain, and cephalgia. (Cephalgia means a headache or a pain in the head. P.N. Collin,
 
 Dictionary of Medicine
 
 (3rd ed.2000).) She was released with instructions to see either the NOPD doctor, Dr. McSwain, or her own doctor.
 

 Four days after the accident, Ms. Reinhardt began treatment with Dr. Altman, whose treatment of her is outlined below:
 

 • September 7, 2004 — initial visit: Dr. Altman’s diagnosis was contusion of the head, cervical spine strain, trapezius muscle sprain, lumbar spine sprain, and paresthesia of the upper and lower extremities. He noted that “[a]ll symptoms and findings are causally related to
 
 *241
 
 the [September 4, 2004] accident.” He placed her on full disability for a week.
 

 • September 21, 2004 — second visit: Dr. Altman noted that her headaches, left hip, and lower back felt worse; her neck and shoulders felt better. He instructed her to have an MRI of the left hip, shoulder, | ^cervical, and lumbar spines and to consult a neurologist for her headaches.
 

 • October 8, 2004 — third visit: Dr. Altman noted that her headaches, right hand, and lower back felt the same, but her neck felt worse. He indicated that she was to remain on light duty for the next three weeks.
 

 • October 22, 2004 — fourth visit: He noted that her lower back felt worse; her right hand had pins and needles.
 

 • November 5, 2004 — fifth visit: He noted that her headaches were better; her neck, lower back, right wrist/hand were the same and that “[s]he had carpal tunnel syndrome in the past but her grip got weaker after this accident.” He further noted that she is predominately right handed. Because at this time no MRI had been scheduled, Dr. Altman again instructed her to have an MRI of the lumbar spine. He noted that she was working on light duty, and he indicated that she was to remain on light duty for the next four weeks.
 

 • December 6, 2004 — sixth visit: He noted that her headaches were the same and that she had pain in her neck radiating into her right arm and hand with complaints of pins and needles with swelling of the right hand; she also had pain radiating to the right thigh with complaints of numbness into the right lower extremity. Also on December 6, 2004, Ms. Reinhardt had a lumbar MRI that showed an apparent herniated L5-S1 intervertebral disc and eccentric bulging of the L4-5 intervertebral disc toward the right side.
 

 • January 7, 2005 — seventh visit: He noted that her neck felt the same, but she still was experiencing pins and needles in the right arm and hand but less than before. The lower back also felt the same and pain radiated to the right thigh and leg, and the right lower extremity buckles. She also noted that work was painful. Dr. Altman placed her on light duty restrictions for three weeks.
 

 • January 26, 2005 — -eight visit: She reported that her neck and lower back felt the same to worse secondary to going to the shooting range and that her pain continued to radiate to the entire right lower extremity and the right knee buckles. She also reported that she was working a lot and that it was painful. She was placed on light duty restrictions.
 

 • February 17, 2005 — ninth visit: She indicated that the left side of her neck felt the same and that pain radiated to her right arm and hand with complaints of pins and needles. Her upper and lower back felt the same. She indicated that mild pain still radiated to the right thigh with pins, needles, and numbness into the entire right lower extremity. She experienced weakness in the right lower extremity and Instated that it buckles after standing for long period of time. She was working forty hours a week and indicated it was painful.
 

 • March 11, 2005 — -last visit: Her neck, shoulders, and lower back felt the same. She was instructed to consult a chronic pain specialist.
 

 As suggested by Dr. Altman, Ms. Reinhardt next sought treatment from a chronic pain specialist, Dr. Jase. As noted earlier in this opinion, Dr. Jase was Ms. Reinhardt’s treating physician for several
 
 *242
 
 years until he was prohibited from practicing pain management in early 2008. From 2005 to early 2008, Dr. Jase saw Ms. Reinhardt about once every two weeks, save for the period after Hurricane Katrina. He acknowledged completing the Form 50s spanning January 2006 to January 2007 as well as the letter to the NOPD dated January 12, 2007, which stated:
 

 Ms. Reinhardt has been and continues to be under my care for the treatment of cervicalgia and lumbago. She has undergone multiple treatment options including trigger point injections, home exercises programs and anti-inflammatory medications. She was referred to Dr. Charles April and underwent two cervical and lumbar epidural steroid injections, all of which gave her minimal or unsatisfactory relief. Ms. Reinhardt continues to complain of neck and lower back pain, numbness and tingling in her right arm and leg, which have worsened. As a result she is unable to write, shoot, stand and/or walk for long periods of time. For these reasons, I also referred Ms. Reinhardt to Dr. Najeeb Thomas, a neurosurgeon, for evaluation of possible surgical intervention. At this time, Ms. Reinhardt is unable to return to work in any capacity regarding her ability to use her firearm and to defend herself.
 

 On September 8, 2006, Dr. Jase wrote a letter to the CCMSI claims adjuster stating that the injections Dr. April performed had given Ms. Reinhardt minimal or unsatisfactory relief and that he was now referring her to Dr. Thomas, a neurosurgeon, for evaluation of possible surgical intervention.
 

 |2iOn December 7, 2006, Dr. Thomas first saw Ms. Reinhardt and ordered a new MRI of the lumbar and cervical spine and an EMG of the right upper extremity. In his report, Dr. Thomas summarized the history he was given by Ms. Reinhardt starting with the September 2004 motor vehicle accident as follows:
 

 • She immediately had neck and low back pain, but within a week began to get some right-sided pain in her arm and numbness in her right hand. She has had difficulty writing. She also has some numbness in the left hand, but much worse in the right. She states that someone diagnosed this as Saturday night palsy, but she still had persistent problems.
 

 • She has tried multiple therapies and has seen Dr. April’s group and had what appears to be facet injections and medial branch block injections. She did have an interlaminar epidural steroid injection at L4-5. She apparently had facet injections at C4-5 and C5-6 on the right. None of these have given her long-term relief.
 

 • She did work after the accident off and on intermittently and did work during Hurricane Katrina, but she has been disabled for 11 months.
 

 On May 8, 2007, Dr. Thomas saw Ms. Reinhardt again. On this visit, he reviewed with Ms. Reinhardt the results of her EMG and MRI. The cervical spine MRI revealed no problems, but the MRI of the lumbar spine showed a possible lateral disk at L4. (The radiologist’s report regarding the 2007 MRI indicated that the results were comparable with the 2004 MRI results.) The EMG showed severe right carpal tunnel syndrome. Dr. Thomas proposed the following treatment plan: (i) referral to Dr. George for evaluation for severe right carpal tunnel syndrome, (ii) referral to Dr. Borchardt for an L4 trans-foraminal epidural steroid injection on the right, and (iii) follow up with Dr. Thomas after seeing Dr. George and having |22the epidural injection. As of the time of trial,
 
 *243
 
 the NOPD had not authorized her treatment with Dr. George.
 

 Although in his letter to the NOPD dated January 2007 Dr. Jase did not mention or relate Ms. Reinhardt’s disability to return to work as a police officer to the September 2004 accident, Dr. Jase in his subsequent deposition taken in August 2008 testified that the accident played some part in Ms. Reinhardt’s overall disability. Dr. Jase further testified that he agreed that the September 2004 accident, at least in part, contributed to or aggravated her preexisting conditions and made her symptomatic in the conditions that he treated her for — the neck, back, and arms. He explained that on her initial visit to him Ms. Reinhardt gave a history of a fifteen-year complaint of neck and back pain. Since the September 2004 accident occurred the year before he saw her, Dr. Jase opined that it was a reasonable assumption that the accident played some part in her progression. He further opined that her current condition was the result of a “constellation of the events.”
 

 At trial, Dr. Jase testified that he did not make any findings that disagreed with Dr. Altman’s initial assessment or opinion that Ms. Reinhardt’s neck and back pain were related to the 2004 motor vehicle accident. Dr. Jase further testified that he found nothing to disagree with Dr. Altman’s opinion in his November 2004 report that Ms. Reinhardt’s preexisting carpal tunnel syndrome and related symptoms were aggravated by the September 2004 accident. Dr. Jase still further | ¡^testified that Ms. Reinhardt was not a malingerer, symptom magnifier, or drug seeker.
 

 On November 7, 2008, during the trial of this matter, Dr. Lutz saw Ms. Reinhardt and performed a SMO evaluation on the NOPD’s behalf. As part of his evaluation, Dr. Lutz had Ms. Reinhardt categorize her present complaints that she believed precluded her from being able to work in decreasing order of severity; her response was as follows: (1) lower back pain greater on the right than on the back rated as an 8 out of 10 which never goes away; (2) lower neck pain which is always present; (8) right sided arm and leg tingling; (4) inability to use right hand to hold a gun and has to use her left hand to hold up her right hand; and (5) depression and fatigue. Dr. Lutz noted that Ms. Reinhardt listed her symptoms on the history form she completed on the day of the evaluation as “[n]eck, lower back, R/leg and arm numbness, pain, loss of motion overall, no long term sitting, standing, walking without pain and numbness.”
 

 In his report dated November 17, 2008, Dr. Lutz opined that Ms. Reinhardt’s current conditions — her neck, back, and leg complaints — cannot be related to her September 2004 motor vehicle accident. He explained that all of her current complaints are subjective and unsupported by any objective findings. He noted that she did have an EMG confirmed severe carpal tunnel syndrome and that “[t]he compression of her right median nerve explains her right hand complaints and is the reason she cannot comfortably handle a hand gun.” Dr. Lutz further noted that “[t]his nerve compression syndrome would not have been caused by her MVA.” I^Dr. Lutz opined that Ms. Reinhardt’s pain complaints were grossly disproportionate to her objective findings and clinical course. He further opined that her objective findings and clinical course are consistent with malingering as her neck, back, and leg objective findings do not meet any criteria for diagnosis of any condition that can be attributed to her September 2004 accident.
 

 Dr. Lutz explained his reasons underlying his opinions as follows. First, he noted there were multiple inconsistencies be
 
 *244
 
 tween Ms. Reinhardt’s history as she related to him and her medical records. He cited as an example her telling him she had no prior history of carpal tunnel syndrome despite the December 2006 diagnosis, based on an EMG, of severe carpal tunnel syndrome and the May 2007 referral to Dr. George for this problem.
 

 Second, he noted that when Ms. Reinhardt presented to the emergency department on the date of the accident she did not have clinical findings compatible with an acute lumbar disc problem or with any hand or wrist injury. At the time of her emergency room visit, she was already taking Vicodin and Soma, medications which are prescribed for musculoskeletal complaints.
 

 Third, the December 2006 EMG study showed that her right upper extremity and hand clumsiness were due to medial nerve compression at the wrists, which would not be related to a motor vehicle accident trauma. (He noted that the medial nerve runs from the forearm passing through the carpal tunnel in the wrist into the hand.)
 

 [asFourth, he noted that despite receiving extensive treatments and injections over the four year period since the accident, Ms. Reinhardt showed no significant symptom improvement. Dr. Lutz attributed this type of non-response to treatment as a sign of symptom exaggeration.
 

 Fifth, Dr. Lutz characterized the cervical and lumbar findings reported in the 2004 and 2007 MRIs as having doubtful clinical significance and as more likely than not preceding her September 2004 accident. He noted that she had no objective diagnosis temporally related to the September 2004 accident of any spine problem that would have caused her symptoms.
 

 Finally, he stated that Ms. Reinhardt’s clinical course included “obvious symptom magnification, exaggerated pain behaviors, and less than maximum efforts.” He further stated that malingering was strongly suggested by several factors.
 

 Summarizing his findings, Dr. Lutz opined that although Ms. Reinhardt has symptoms related to right carpal tunnel syndrome, he could find no objective manifestations of any symptoms or impairment related to the September 2004 accident and that her subjective complaints were suspect and unreliable. Dr. Lutz also testified that the medication and course of treatment that Dr. Jase prescribed for Ms. Reinhardt were inappropriate.
 

 Given the conflicting medical testimony provided by Dr. Jase and Dr. Lutz coupled with Ms. Reinhardt’s testimony and her extensive medical treatment, we cannot conclude the WCJ was manifestly erroneous in finding Ms. Reinhardt 1 ¡^established by a preponderance of the evidence a work-related disability. This, however, does not end the inquiry as to whether Ms. Reinhardt met her burden of establishing entitlement to workers’ compensation disability benefits. “While a showing that there is no work related disability is enough to deny benefits, the converse is not true.... It is not enough just to prove the inability to continue in the pre-injury job.”
 
 Rapp v. City of Neiu Orleans,
 
 95-1638, p. 5 (La.App. 4 Cir. 9/18/96), 681 So.2d 433, 438. A claimant seeking any type of disability indemnity benefits — TTD or SEB — must meet an additional burden of proof.
 

 A claimant seeking TTD must not only establish a work related disability, but also establish by clear and convincing evidence, unaided by any presumption of disability, that she is physically unable to engage in any employment or self-employment. La. R.S. 23:1221(l)(c). A claimant who can perform light duty work is not entitled to TTD benefits.
 
 Holden v. International Paper Co.,
 
 31,104, p. 2 (La.App. 2
 
 *245
 
 Cir. 10/28/98), 720 So.2d 442, 444. “Thus, the question is not whether the workers’ compensation claimant could perform the previous work but, rather, whether the claimant could perform some sort of work.”
 
 Picquet v. Teco Bulk Terminal,
 
 08-793, p. 11 (La.App. 5 Cir. 4/28/09), 13 So.3d 208, 216.
 

 The medical evidence does not clearly and convincingly show that Ms. Reinhardt could not return to some type of work. No evidence was introduced to support the finding that Ms. Reinhardt was incapable of performing some type of work. Her own doctors indicated that she could perform at least light duty. Dr. Altman, with the exception of the week immediately after the accident, Inconsistently indicated that she could work light duty. Dr. Jase testified that although she could not return to work as a police officer, he believed she could perform some other type of work. We thus find that Ms. Reinhardt failed to meet her burden of proof that she was unable to engage in any employment. Accordingly, we find the WCJ’s award of TTDs was improper.
 

 When an employee’s work-related injury does not result in total disability, she may still be entitled to an award of SEB, which is a subset of TTD.
 
 Bolton v. Grant Parish School Bd.,
 
 98-1430, p. 5 (La.3/2/99), 730 So.2d 883, 886. The purpose of SEB is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840, p. 8 (La.7/1/97), 696 So.2d 551, 556;
 
 Pinkins v. Cardinal Wholesale Supply, Inc.,
 
 619 So.2d 52, 55 (La.1993).
 

 To qualify for SEB, a claimant is required to prove by a preponderance of evidence that a work-related injury resulted in the inability to earn 90% or more of his average pre-injury wage. La. R.S. 23:1221(3)(a). Once the claimant makes this showing, the burden shifts to the employer, who must prove by a preponderance of evidence that the claimant is physically able to perform a certain job and that the job was offered to the claimant or was available in the claimant’s or the employer’s community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i).
 
 [11]
 
 Once the employer succeeds in sustaining its burden, the burden |2Sshifts back to the claimant to show by clear and convincing evidence, unaided by any presumption of disability, that the claimant is unable to perform the employment offered solely as a consequence of substantial pain. La. R.S. 23:1221(3)(c)(ii).
 

 The jurisprudence has recognized the need for an appellate court to remand for a determination of whether the claimant is entitled to SEB when “the record contains no testimony concerning the appellee’s educational level, previous training, or work experience.”
 
 Schmitt v. City of New Orleans,
 
 632 So.2d 367, 374 (La.App. 4th Cir.1993);
 
 Rapp, supra; Picquet, supra.
 
 Such is the case here. Although Ms. Reinhardt’s post trial brief requests a finding of either TTD or SEB, the focus at trial was on the issue of whether Ms. Reinhardt had a work-related disability. The issue of SEB was not addressed. Because of the lack of evidence in the record on the SEB
 
 *246
 
 issue, we find it necessary to remand so that both parties can present evidence on the issue. On remand, Ms. Reinhardt can put on evidence of her inability to earn 90% of her pre-accident wages. The NOPD then will be entitled to offer evidence of available jobs. Ms. Reinhardt will then be allowed to offer rebuttal evidence of working in pain.
 

 DECREE
 

 For the foregoing reasons, the WCJ’s judgment dated January 30, 2009, denying the NOPD’s exception of prescription is affirmed. The WCJ’s judgment dated March 3, 2009, is reversed insofar as it awards Ms. Reinhardt TTD and interest thereon; in all other respects, the judgment is affirmed. This matter is |2!)remanded for further proceedings consistent with this opinion, including a hearing to determine Ms. Reinhardt’s entitlement to SEB.
 

 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 

 [1]
 

 . The ADD manages officers who are out sick or assigned to limited duty positions. The ADD is not limited to work-related illnesses or accidenls. The ADD monitors and regulates the injured or sick employees through their healing process. If the employees do not heal, the ADD makes recommendations to the superintendent. Officers are allowed to work in limited duty assignments until they are able to come back to full duty and be transferred back lo their original assignments. The ADD is distinct from the department that handles WC claims.
 

 [2]
 

 . As discussed elsewhere in this opinion, the parties dispute whether Ms. Reinhardt turned these Form 50s into the ADD individually on a timely basis or in bulk — 25 at once — at the end of the period, January 2007.
 

 [3]
 

 . As of the time of trial, the NOPD had not authorized her treatment with Dr. George On the first day of trial, the parties entered a stipulation as to the following:
 

 1) That the Claimant would put on her case on 9/23/08; and the City would put on its case on 11/19/08.
 

 2) The Claimant agrees to keep her SMO (Second Medical Opinion) appointment with Dr. Lutz on 10/8/08 at 2 p.m. [Ms. Reinhardt failed to keep the original appointment. For that reason, she was seen at a later date, November 7, 2008.]
 

 3) The City will authorize Claimant's evaluation by a neurologist of her choice. The City will also authorize an evaluation of the Claimant’s wrists by Dr. Eric George if Dr. Najeeb Thomas decides it is still warranted.
 

 4) The City will request Dr. Lutz to fax a report to counsel for both parties on or before Monday, October 13, 2008.
 

 5) The City will undertake its best efforts to pay Dr. Jase's bill within the next ten business days with the understanding that Dr. Jase will provide documentation to facilitate said payment. The Claimant will waive penalties and attorney fees if Dr. Jase's bill is paid within that time frame.
 

 [4]
 

 . Based on Ms. Reinhardt’s testimony regarding her immediate awareness that she was injured in the accident, the NOPD filed an exception of prescription at trial, which was later submitted in writing, heard, and denied.
 

 [5]
 

 . Lieutenant Salvant testified that the options that were available to Ms. Reinhardt included voluntarily resigning, applying for a disability pension, applying for training through workers' compensation to do another type of job, or do nothing in which case the NOPD would have options available.
 

 [6]
 

 . CCMSI is the NOPD’s third party administrator. CCMSI is responsible for processing and paying the NOPD's workers’ compensation claims.
 

 [7]
 

 . A copy of the Consent Order Dr. Jase signed with the Louisiana State Board of Medical Examiners was introduced into evidence.
 

 [8]
 

 . For ease of discussion, the medical evidence pertaining to Ms. Reinhardt's disability, including Dr. Lutz's and Dr. Jase's testimony regarding that issue, is summarized elsewhere in this opinion.
 

 [9]
 

 . Although Ms. Reinhardt failed to answer the NOPD's appeal, she argues that it is appropriate for this court to address the issue of penalties and attorney's fees and to award them to her. We disagree. The issue of penalties and attorney’s fees is not before us on appeal.
 

 [10]
 

 . La. R.S. 23:1122 provides:
 

 The employer shall cause the examination provided for in the preceding Section to be made immediately after knowledge or notice of the accident, and to serve a copy of the report of such examination made by the employer’s physician upon the employee within six days after the employer’s receipt of the report of such examination. If the examination is not made and the report is not furnished by the employer within that time, the employee shall furnish a report of the examination made by his own physician to the employer, for which the employee shall be entitled to receive from the employer the actual cost of the examination and the actual cost of the report. The physician’s invoice or receipt shall be prima fa-cie proof of the cost. Upon the receipt by either party of such a report from the other party, the party receiving it, if he disputes the report or any statement therein, shall notify the other of that fact within six days, otherwise the report shall be prima facie evidence of the facts therein stated in subsequent proceedings under this Chapter.
 

 [11]
 

 . An employer can discharge its burden by establishing (1) the existence of a suitable job within claimant’s physical capabilities, (2) the amount of wages an employee with claimant's experience and training can expect to earn in that job, and (3) an actual position available for that particular job at the time the claimant received notification of the job’s existence.
 
 Seal v. Gaylord Container Corp.,
 
 97-0688, p. 9 (La.12/2/97), 704 So.2d 1161, 1167;
 
 Noto v. City of New Orleans Fire Dept.,
 
 04-0472, p. 6 (La.App. 4 Cir. 9/1/04), 883 So.2d 439, 444.