ROSEMARY LEDET, Judge.
|! This is a workers’ compensation case. The principal issue presented on appeal is whether the Office of Workers’ Compensation (“OWC”) erred in finding the employee met his burden of proving an unwit-nessed, work-related accident that caused an aggravation of a preexisting left knee injury. A secondary issue is whether the OWC erred in rejecting the employee’s claim that the compensable knee injury caused a subsequent, more disability shoulder injury. From the OWC’s judgment awarding $6,474.00 in temporary total disability benefits (“TTD”) and an unspecified sum of medical expenses for the knee injury only, both the employee, Russell Marti, and the employer, the City of New Orleans, appeal. For the reasons that follow, we affirm in part, reverse in part as to the unspecific sum of medical expenses, and remand for the determination and the award of a specific sum of medical expenses.
FACTUAL AND PROCEDURAL BACKGROUND
From August 2008 to June 2010, Mr. Marti was employed by the City in the Division of Property Management as a Building Maintenance Manager (Engineering). He was the chief engineer over all the City’s approximately three hundred *544 buildings, including its four majority buildings — City Hall, Civil District 12Court, Municipal Traffic Court, and Criminal District Court. His job duties entailed operating and maintaining the City’s buildings. His job duties included not only supervising, but also performing the physical tasks of routine repair work. His job duties thus required frequent standing, walking, sitting, balancing, stooping, kneeling, crouching, crawling, reaching, working overhead, and climbing.
On the day of the alleged accident (which was in late July or early August 2009),[1] Mr. Marti’s supervisor, Pamela Smith (the Director of Property Management), dispatched him to fix a roof-top air conditioner at the New Orleans Police Department (“NOPD”) Evidence Building. To do so, Mr. Marti had to climb a nonstandard ladder — which was about fourteen inches wide — and enter a narrow hatch — which was about two feet squared — that opened up to the roof. He climbed the ladder, entered the hatch, and checked the air conditioner on the roof without a problem. When he was coming down the ladder, however, he claims that he reinjured his left knee. According to Mr. Marti, he had to twist his body into an awkward position to fit through the hatch and to reach the rungs of the ladder. In so doing, he claims that his left knee popped or snapped. Mr. Marti acknowledges that he had prior problems with his left knee, including a surgery in the 1990s on that knee and preexisting severe arthritis in that knee. Mr. Marti, however, claims that despite having preexisting arthritis in his left knee, he was able to perform his job duties for twenty years before the ladder incident without any problems.
|sOn July 20, 2010, Mr. Marti commenced this ease by filing a disputed claim for compensation (Form 1008) against the City. In his petition, he alleged that the date of the accident was between July 26 and August 10, 2009; the place of the accident was the NOPD Evidence Building; and the details of the accident were as follows:
I re-injured my left knee going through rooftop hatch door. Diagnosed meniscus tear and loose body.... To exit roof top onto makeshift ladder and due to akward [sic] position and small size of hatch and ladder conditions, my left knee snapped as I exited the roof top....
Mr. Marti alleged that he verbally reported this incident to his supervisor. He also alleged that “[a]s a result of the above left knee re-injury, my left knee gave way and I fell and tore my right shoulder rotator cuff on 3/[10]” and that he was medically unable to return to work. He sought to recover indemnity benefits, medical expenses, and reimbursement of insurance premiums paid by him (COBRA payments). The City answered the petition averring that Mr. Marti did not sustain an accident or injury within the meaning of the Louisiana Workers’ Compensation Act (“LWCA”).
At the September 8, 2011 trial of the case, the parties stipulated to the following:
• Between July 10, 2009, and August 31, 2009, Russell Marti was an employee of the City of New Orleans.
*545 • At the time of the alleged accident, Mr. Marti was a salaried employee— Mr. Mr. Marti testified that his yearly salary was $65,500 — and was scheduled to work forty hours a week; his workers’ compensation rate was the maximum rate of $546.00 weekly; and the City was self-insured.
• The City neither paid any indemnity benefits nor paid any of the expenses for medical treatment to (or on behalf of) Mr. Marti as a result of the alleged accident.
14Four witnesses testified at trial: Mr. Marti; his wife, Sandra Marti; his coworker, Alan Burkhardt; and his supervisor, Pamela Smith. The deposition testimony of Mr. Marti’s two treating physicians for his knee injury, Dr. Bruce Samuels and Dr. Frederick Keppel, was introduced in lieu of live testimony. To provide a framework for analyzing the issues presented on appeal, we briefly summarize the six witnesses’ testimony.
RUSSELL MARTI
Mr. Marti testified that in the end of July or beginning of August 2009 he was injured while performing an air conditioning maintenance (repair) job on the roof of the NOPD Evidence Building. Although he was a manager, he explained that he was sent to perform such manual repair work because the City was understaffed. He further explained that the accident occurred when he was in an awkward, twisted position attempting to maneuver off the roof through the small, square hatch and reaching for the rung on the makeshift (non-standard) ladder. Given his size — six feet tall and obese — he had to turn sideways on an angle to fit through the hatch. As he was reaching with his leg for the rung of the ladder and put all his weight on his left leg, he felt something pop or snap in his left leg, which caused him to have severe pain. He admitted that he did not fall off the ladder.
Mr. Marti testified that he related the unwitnessed accident to others in the following order: first, his co-worker, Alan Burkhardt; second, his supervisor, Ms. Smith; third, his wife, Sandra Marti; fourth, his orthopedic surgeon, Dr. Frederick Keppel; and fifth, his attorney.
Following the accident, Mr. Marti left the NOPD Evidence Building and went out to lunch with a co-worker, Mr. Burk-hardt. At lunch, Mr. Marti was | Jimping. Mr. Burkhardt asked him why he was limping. Mr. Marti replied that he was coming down the ladder at the NOPD Evidence Building and twisted his left knee.
Later that same day, Mr. Marti told his supervisor, Ms. Smith, about the accident.[2] He testified that the reason he told Ms. Smith about the accident “to alert her that that’s why [he] ... was out sick” the following day, which was a Friday. When he went home from work that day, Mr. Marti told his wife about the incident. He told her that he went down a ladder and that he thought he did something to his knee because it was painful.
The next person Mr. Marti indicated in his testimony that he told about the accident was his orthopedic surgeon, Dr. Kep-pel. According to Mr. Marti, he told Dr. Keppel at his first office visit, which was on October 9, 2009, that he was coming off a roof when he hurt his knee and that he *546 did not know if it was a work-related injury. Mr. Marti further testified that at a follow-up -visit (apparently the March 25, 2011 visit) he told Dr. Keppel that “this may be becoming a workman’ comp case because he had filed [a disputed claim] for it.”
The last person that Mr. Marti indicated he told about the accident was the attorney he consulted in July 2010 regarding filing a civil service claim against the City after his employment was terminated in June 2010. When he related the ladder accident to his attorney, she informed him that he had a potential workers’ compensation claim against the City. Mr. Marti testified that until this time he was unaware if he had a workers’ compensation claim. He explained that he was | ^unaware if he had a claim since he only made a verbal report of the accident to the City and apparently no written report was prepared.
Mr. Marti acknowledged that until he filed this workers’ compensation claim against the City in July 2010, the only notice he gave the City of the accident was the verbal report he made to Ms. Smith on the day it occurred. Mr. Marti testified that when he told Ms. Smith about the accident, she never mentioned anything about completing a written report. Rather, he recalled that Ms. Smith’s responded by threatening to discipline him because he had not reported the accident immediately. Mr. Marti testified that he never followed up with either Ms. Smith or anyone with the City because “all the time, I thought that my leg would be repaired and I’d be going back to work. That’s what I would have thought. I didn’t really think about anything else, just trying to get back to work.”
Mr. Marti testified that the accident occurred on a Thursday and that he took the next day — a Friday — off as a sick day. He returned to work on the following Monday. Although Mr. Marti continued to work for a while (until February 2010) after the accident, he testified that he told his supervisor, Ms. Smith, that because his leg was hurt he would be taking another engineer with him because he was having problems with climbing, squatting, and similar types of activities. He explained that the other engineer “would be with him, and [the other engineer] ... could get up and down the ladders.” Mr. Marti also noted that in August 2009, Dr. Samuels provided him with a “return-to-work” slip indicating that he was able to work with the restriction of no stair climbing.
Mr. Marti first sought treatment for his knee about three weeks after the accident — in August 2009. He waited to seek treatment until his standing biannual appointment — every February and August— with his primary care physician, Dr. 17Samuels. At his standing August 2009 appointment, Mr. Marti did not mention having any recent trauma or injury. Nor did he mention that his knee injury involved a workers’ compensation claim. Rather, he mentioned to Dr. Samuels that he was coming off a roof and experienced a popping of his left knee. Mr. Marti believed that he also mentioned that he “twisted that leg” and that the doctor simply failed to put it in his notes.
At the August 2009 visit, Dr. Samuels provided Mr. Marti with a return-to-work note restricting him from climbing stairs. He also ordered ultrasounds of both knees and, based on the results of the ultrasounds, referred Mr. Marti to see an orthopedic specialist. (As noted above, Mr. Marti saw Dr. Keppel in October 2009; and, as noted below, Mr. Marti had knee surgery in February 2010.)
In March and April 2010, Mr. Marti filed for, and obtained, private long term disability income benefits under his policy *547 with Hartford Life Insurance Company. Dr. Keppel assisted Mr. Marti in completing the paperwork for that disability benefits claim. In so doing, Dr. Keppel asked Mr. Marti if the knee re-injury was work-related. Mr. Marti responded that he did not know at that time if it was work-related. Mr. Marti explained that he thought he was going back to work and that he was not trying to claim a workers’ compensation injury. Mr. Marti also acknowledged that he filed for, and obtained, Social Security disability benefits. In so doing, he did not report to Social Security that the left knee re-injury was work related.
While recovering from his knee surgery, Mr. Marti testified that his left knee gave way in his yard at home in March 2010 when he was trying to put more weight on it as his doctor instructed him to do. When he fell, he tried to catch |8himself with his right arm and re-injured his right shoulder. On May 19, 2010, Mr. Marti had surgery for his right shoulder. (Dr. Dev-raj performed that surgery.)
Beginning on the date of the knee surgery (February 25, 2010), Mr. Marti took leave under the Family Medical Leave Act (“FMLA”), due to his medical condition and knee surgery. His FMLA leave ended on May 19, 2010 (the date of his shoulder surgery). Thereafter, he never returned to work. On June 4, 2010, the City terminated Mr. Marti from employment because he was unable to return to work due to health reasons.
SANDRA MARTI
Sandra Marti, Mr. Marti’s wife, corroborated Mr. Marti’s testimony that he told her about the ladder incident when he returned home from work on the day that it occurred. Although she was unsure of the date of the accident, she testified that she was certain the accident occurred on a Thursday because her husband took the next day (Friday) off from work to have the long weekend to allow his leg to recover so that he could return to work on Monday. She testified that she observed her husband was in pain. She asked her husband if he reported the injury to his supervisor, and he told her that he had reported it.
Mrs. Marti accompanied her husband to see Dr. Samuels in August 2009 and Dr. Keppel in October 2009. When they saw Dr. Keppel for the first time, Dr. Keppel asked them if the knee injury involved a workers’ compensation case. Mrs. Marti testified that they told him it might be and that her husband described for the doctor how the accident occurred.
ALLAN BURKHARDT
Allan Burkhardt, Mr. Marti’s co-worker, testified that he worked for the City’s Department of Property Management for thirty-two years and was a | ^superintendent. Mr. Burkhardt testified that on the day of the accident he had lunch with Mr. Marti at Betsy’s on Canal Street. According to Mr. Burkhardt, Mr. Marti came limping into Betsy’s, stated that he had just come from a job at the NOPD Evidence Building, and stated that he had injured his knee coming down a ladder. Mr. Burkhardt testified that he remembered telling Mr. Marti to “[m]ake sure you report this injury. Because the way the system is set up, if you wait too long to report, it might not look good.” He indicated that Mr. Marti stated that he was going to take care of it.
PAMELA SMITH
Pamela Smith, Mr. Marti’s supervisor at time of accident, testified that she was employed by the City from November 2006 to June 2010 as Director of Plant Operations. In August 2008, she hired Mr. Mar-ti as a chief engineer. At that time, he was recovering from surgery for kidney *548 cancer. Ms. Smith characterized Mr. Mar-ti as a competent, credible, honest, and a “very good employee.” She called on him for emergencies because he was chief engineer and because this was part of his job responsibility. Although she had no specific recall of sending Mr. Marti to perform an air conditioning repair (maintenance) assignment at the NOPD Evidence Building, she admitted that on numerous occasions she had called Mr. Marti to handle such emergency repair assignments in City buildings.
According to Ms. Smith, the procedure for reporting work-related injuries was that employees were required first to notify their immediate supervisor and then to complete written reports and turn them into the Human Resources Manager. Ms. Smith was Mr. Marti’s supervisor; he reported directly to her. Ms. Smith had no recall of Mr. Marti verbally notifying her of any job-related injury. Nor did she recall threatening him with any disciplinary action for failing to timely 11nreport a work-related accident. She acknowledged .that she could not say that a work-related injury did not occur; rather, she could only say that she did not remember Mr. Marti ever mentioning an incident that happened causing him an on-the-job injury.
Ms. Smith testified that she was a very busy person — she was responsible for about three hundred City buildings, managed about eighty employees, and received almost a thousand emails a week. Because she was so busy, she admitted that sometimes employee problems were brought to her attention, but slipped through the cracks. Nonetheless, she clarified that she never let any serious employee problem, such as a work-related injury, be neglected.
DR. BRUCE SAMUELS
Dr. Bruce Samuels, an internal medicine doctor, testified by deposition. He testified that he saw Mr. Marti for his regularly scheduled visit in August 2009. By way of background, Dr. Samuels noted that Mr. Marti was an established patient who had been seen by his office since at least 1995. Dr. Samuels further noted that both he and his former partner had treated Mr. Marti for various conditions, including knee problems. Dr. Samuels noted that Mr. Marti had a preexisting problem with both knees and that he often complained of knee pain. Dr. Samuels explained that in February 1995 his partner noted that Mr. Marti was on disability for his knees[3] and that in 2005 his partner noted that Mr. Marti had “degenerative joint disease of the knee.” Dr. Samuels further noted that Mr. Marti’s first mention of knee problems was in 1995, at age 45, which was a little young to attribute his knee problems solely to the aging process.
InDr. Samuels further testified that, as Mr. Marti’s primary care physician, he saw Mr. Marti biannually — each February and August. At the February 2009 visit, Dr. Samuels ordered x-rays of both Mr. Mar-ti’s knees, but did not order ultrasounds. Dr. Samuels testified that the x-ray results revealed that Mr. Marti had osteoarthritis and “osteochondromatoses” — degeneration of the cartilage because the spaces are narrowed — in both knees.
At the August 2009 visit, Dr. Samuels not only provided Mr. Marti with a return to work note restricting stair climbing, but also ordered ultrasounds of both knees. Opining that during the six month interval *549 between the February and August 2009 visits there must have been some worsening, Dr. Samuels explained:
“[I]n February of '09, if I’d have thought he had fluid in the knees, I would have gotten in addition to the X-rays ultrasounds at that time, and I didn’t. And then he comes back in in— comes back in, and I get ultrasounds the next week. So he has some objective findings of effusions, or fluid, in the knees. So I would say yes, there’s some indication that things have gotten worse.”
Dr. Samuels acknowledged that he could not say one way or another whether things got worse as a result of some trauma or just a continuation of what he observed at the February 2009 office visit. Dr. Samu-els explained that he could not make that determination because he did not have anything mentioned in his notes regarding whether Mr. Marti hurt himself or had some trauma or injury. Dr. Samuel also confirmed that he had noting mentioned in his notes about a ladder incident and that he had no personal recollection of Mr. Marti telling him about any sort of injury. Nonetheless, Dr. Samuels confirmed that he wrote a return to work note for Mr. Marti and thus Mr. Marti “must have talked about something that caused him to be off of work.” Dr. Samuels also confirmed that he had knee pain written in the impressions.
112Pr. Samuels agreed that it could be concluded that Mr. Marti had some kind of preexisting condition with regard his knees when he came to him in August 2009. He further agreed that a trauma or a bending of his knees under certain circumstances could cause an aggravation to that preexisting condition to his knees. He still further agreed that it could be inferred from the fact that Mr. Marti had knee surgery in February 2010 that there had been some aggravation to that preexisting condition.
In response to the question of whether he, as Mr. Marti’s treating physician, could say with a reasonable degree of medical certainty that it was more probable than not that Mr. Marti suffered a knee injury in July or August 2009, Dr. Samuel replied:
“[Ojbjectively, his condition changed between February of '09, when it appears he did not have effusions in his knees to August of '09, when he had effusions in his knees, and I got ultrasounds of his knees at that time. I believe I’ve stated that in the February, in the February 12th, '09, visit. If he’d have objectively had effusions in the knees, I would have gotten ultrasounds then. So I can state with some certainty that, objectively, he’s changed for the worse between those two visits and some type of injury to the knees could be a contributing factor. I’m not an orthopedic surgeon and I would defer that to an orthopedic surgeon.”
Based on the ultrasound results, Dr. Sam-uels, as Mr. Marti’s primary care physician, referred Mr. Marti to an orthopedic specialist.
DR. FREDERICK KEPPEL
Dr. Frederick Keppel, an orthopedic surgeon, testified by deposition. He testified that Mr. Marti first presented to him on October 7, 2009, on referral from Dr. Samuels. At that initial visit, Mr. Marti complained of bilateral knee pain and had chronic arthritis on both knees. Dr. Kep-pel’s recommendation, which Mr. Marti accepted, was for him to perform surgery on Mr. Marti’s left knee to remove |isa loose body and to relieve his symptoms. Dr. Keppel explained that, in this context, a loose body means “a piece of cartilage and bone which is loose in the knee joint.” Dr. *550 Keppel further explained that a loose body is “seen in many cases with arthritis.” Dr. Keppel opined that he would classify the loose body he found in Mr. Marti’s left knee as being the result of chronic arthritis.
In preparing for his deposition, Dr. Kep-pel testified that he reviewed Mr. Marti’s chart. In the chart, the first reference he found to an incident occurring in August 2009 involving Mr. Marti’s knee was a chart note dated March 25, 2011. Explaining the chart note, Dr. Keppel testified:
“In it [the chart note], I see that he was following up for his left knee. He stated he was still having some pain in his left knee. This was after we had done his arthroscopy. This was a little more than a year after his arthroscopy.
In my notes, I wrote in here on addition to the history, my nurse wrote part of the history and I wrote an addition here: The patient injured his left knee at work in August of 2009 coming off of a roof. He felt a pop. I’m not sure if he felt the pop at that time, but it says felt pop on October 7th of 2009. I don’t know if those are two separate instances. I’m not sure if he felt the pop two months later or he felt both at the time of the accident in August of 2009.”
In response to questions regarding to the August 2009 work-related accident, Dr. Keppel testified as follows:
Q. In relation to Mr. Marti’s statement regarding any possibility of a trauma that may have occurred as he described to you [at the March 25, 2011 visit] ... based on your examination and treatment and what you observed when you performed surgery, do you as a physician have any opinion regarding whether or not Mr. Marti’s knee condition was the result of the trauma as described to you?
A. When I first saw him in October 7, 2009, the patient gave a history of having a long history of problems with both of his knees. He had had two previous scopes and apparently had had injuries in the past from high school injuries, perhaps in the military, and also as a fire fighter.
| uWith that said, he underwent arthros-copy February 25th of 2010. The findings that I saw doing his arthroscopy appear to be the result of chronic arthritic changes in his knee. He had chronic diffuse arthritis throughout the knee and he had a loose body present and a degenerative tear of the medial meniscus. My impression was that this was a longstanding problem and had been going on for several years.
The injury which we talked about in August of 2009 at work was not brought to my attention, according to my records, until March 25th of 2011.
The only thing I can say about that accident at work is, it may have aggravated this condition, but the arthritic condition which was in his left knee was there long before he had any injury in 8/2009 at work. So I think the majority of these problems in his left knee were consistent with chronic arthritis which predated this accident, and it’s possible that this accident could have aggravated this condition. But that’s the most I could say.
Q. Okay.
A. It did not look like an acute process or acute injury that I could — that I have seen.
Dr. Keppel acknowledged that in March 2010 he helped Mr. Marti complete a Hartford application for long-term disability benefits. In that application, there is a question whether the condition or injury was related to a work-injury, and the response given is no. In his deposition, Dr. *551 Keppel testified that he still agreed with that negative response.
Given the history he observed, Dr. Kep-pel testified that his opinion was that it was “very possible” that Mr. Marti would have required a surgical procedure such as he performed in February 2010 regardless of whether Mr. Marti was involved in a trauma such as he described having experienced in August 2009. Dr. Keppel also agreed that if someone has an extensive history of degenerative knee problems with a loose body in the knee that person may experience a popping sensation as a symptom, not necessarily as a trauma or an accident.
IibAs to the shoulder injury, Dr. Keppel testified that in his note dated April 14, 2010, he stated:
“[Mr. Marti] fell one week after he had had an MRI done. States increased pain. States right shoulder has severe pain with range of motion and decrease range of motion. My notes here, I added that the patient has a history of chronic right shoulder pain for 20 years.”
Dr. Keppel noted that the shoulder diagnosis based on the MRI was rotator cuff tear.
Following the trial, the OWC Judge rendered judgment finding as follows:
• Mr. Marti carried his burden that he suffered an accident, as defined under the LWCA, and injuries to his left knee in the course and scope of his employment with the City.
• Mr. Marti, however, failed to carry his burden that he suffered such an accident and injuries to his right shoulder. “Mr. Marti’s shoulder problems predated the workplace accident by several months and were not caused by the subject accident, nor were they aggravated by the workplace accident. Nor was the subsequent fall related to the subject accident. Therefore, they are not compensable pursuant to the [LWCA].” Medical bills related to the treatment of Mr. Marti’s shoulder are not compensable because the shoulder problems were not caused, accelerated, or aggravated by the workplace accident.
• Mr. Marti carried his burden that he is entitled to indemnity benefits related to his knee disability. Mr. Marti was awarded TTD in the amount of $6,474.00 from February 25, 2010 (date of the knee surgery) through May 18, 2010 (roughly 12 weeks of TTD at maximum rate of $546).[4]
• The court found Mr. Marti carried his burden that he is entitled to medical benefits related to his knee and ordered the City to pay for his necessary medical treatment related to his left knee, including the medical bills and mileage for the following providers: (1) Dr. Samuels, (2) Dr. Keppel, (3) Dr. Devraj, (4) prescription medication necessary and related to treatment of his left knee injuries, and (5) mileage reimbursement: $30.60, representing visits to Dr. Samuels (24 miles) and Dr. Keppel (36 miles).[5]
*552 |1fi* The court found that Mr. Marti was not entitled to penalties and attorneys’ fees because he failed to plead the same. Coscino v. Louisiana State Boxing and Wrestling Commission, 97-2733 (La.App. 4th Cir.9/9/98), 718 So.2d 1016.
• The court found that there was insufficient evidence to establish Mr. Marti voluntarily left the workforce with the intent to permanently withdraw from the same. Rather, the court found that Mr. Marti left the workforce due to medical conditions which resulted in his disability.
• The court found that it lacked subject matter jurisdiction to determine whether Mr. Marti was entitled to reimbursement of his health insurance premiums.
From this judgment, both sides appealed.
STANDARD OF REVIEW
In worker’s compensation cases, the appropriate standard of review that appellate courts must apply to the OWC’s factual findings is the manifest error or clearly wrong standard. Hahn v. X-Cel Air Conditioning Inc., 12-0236, pp. 4-5 (La.App. 4 Cir. 1/9/13), 108 So.3d 262, 266; Gray v. Marriott Residence Inn, 11-1068, pp. 5-7 (La.App. 4 Cir. 2/1/12), 85 So.3d 163, 166-67 (citing Dean v. Southmark Const., 03-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117). An appellate court cannot set aside an OWC’s factual findings unless its findings are clearly wrong in light of the entire record. Gray, 11-1068 at p. 6, 85 So.3d at 166-67 (citing Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706, 710).
The “bedrock principle” that an appellate court must give deference to the trier of fact’s factual findings, which was set forth in Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), was reiterated in Marange v. Custom Metal Fabricators, Inc., 11-2678, pp. 7-8 (La.7/2/12), 93 So.3d 1253, 1258. Quoting from Canter, the Supreme Court in Marange reiterated that principle:
117When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Id. (quoting Canter, 283 So.2d at 724). As one appellate court has noted, the Supreme Court in Marange “strongly admonished the intermediate courts to defer to the WCJ’s reasonable credibility calls and factual findings.” Brown v. Offshore Energy Service, Inc., 47,392, p. 9 (La.App. 2 Cir. 8/8/12), 104 So.3d 494, 501.
On the other hand, when legal error interdicts the fact-finding process in a workers’ compensation case, “the de novo, rather than the manifest error, standard of review applies.” Tulane University Hosp. & Clinic v. Lockheed Martin Corp., 11- *553 0179, p. 3 (La.App. 4 Cir. 6/29/11), 70 So.3d 988, 990 (citing MacFarlane v. Schneider Nat’l Bulk Carriers, Inc., 07-1386, p. 3 (La.App. 4 Cir. 4/30/08), 984 So.2d 185, 188).
DISCUSSION
As noted at the outset, both the City[6] and Mr. Marti[7] contemporaneously appealed the OWC’s decision. For discussion purposes, we divide our analysis 118into the following six sections: (i) occurrence of a work-related accident, (ii) causation of aggravation of a preexisting condition, (in) entitlement to TTD, (iv) reimbursement of medical expenses, (v) imposition of penalties and attorneys’ fees, and (vi) jurisdiction over claim for reimbursement of insurance premiums.

(i) occurrence of a work-related accident

The threshold requirement an employee in a workers’ compensation case must establish is “personal injury by accident arising out of and in the course of his employment.” LSA-R.S. 23:1031 (emphasis supplied). An “accident” is statutorily defined as “an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” La. R.S. 23:1021(1). Although the jurisprudence has liberally construed the work-related accident requirement, the employee’s burden of proof is not relaxed; “[rjather, as in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence.” Bruno v. Harbert International Inc., 593 So.2d 357, 360-61 (La.1992).
On appeal, the City argues that the OWC judge erred in finding that Mr. Mar-ti met his burden of proving the occurrence of a work-related accident under 119the LWCA. The City contends that the OWC’s finding of a work-related accident was manifestly erroneous for four reasons. First, the City contends that Mr. Marti’s popping sensation in his knee, according to his treating surgeon (Dr. Keppel), could have been a symptom of the degeneration in his left knee as opposed to a trauma or an accident. Second, Mr. Marti’s testimony that he was unaware he had a workers’ compensation claim until almost a year after the accident, July of 2010, when he brought this suit is inconsistent with his testimony that he told Ms. Smith on the day of the accident that he had a work- *554 related injury. Third, the medical evidence shows that Mr. Marti failed to report a history of an accident or a trauma to his treating physicians for his knee until March 25, 2011, when he first advised Dr. Keppel of the work-related nature of his knee problem, which was after this workers’ compensation case was commenced. Contemporaneously, Mr. Marti had his treating physicians completing applications for disability benefits under a private policy with Hartford and for Social Security disability benefits. In those applications, either it was stated that his knee injury was not work-related or it was simply not stated that it was a work-related injury. Fourth, Mr. Marti commenced this workers’ compensation case to obtain payment of his medical expenses after exhausting his FMLA eligible leave time. The City thus contends that the inconsistencies in Mr. Marti’s actions and medical records cast serious doubt on his testimony that a work-related accident occurred. The City further contends that there is no medical evidence to corroborate Mr. Marti’s claim of a work-related accident.
In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness’s uncontradicted testimony, although the witness is a party, absent “circumstances casting suspicion on the Unreliability of this testimony.” West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1147 (La.1979). The trial court’s determinations as to whether the worker’s testimony is credible and whether the worker has discharged his burden of proof are factual determinations not to be disturbed on review unless manifestly erroneous. Gonzales v. Babco Farm, Inc., 535 So.2d 822, 823-24 (La.App. 2d Cir.1988) (collecting cases).
It is undisputed that the alleged accident in this case was unwitnessed. An employee’s testimony alone may be sufficient to establish an unwitnessed work-related accident provided the following two factors are satisfied: (1) no other evidence discredits or casts serious doubt upon the employee’s version of the incident; and (2) the employee’s testimony is corroborated by the circumstances following the alleged incident. Bruno, 593 So.2d at 361 (citing West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979)).
The first Bruno factor was addressed by the Supreme Court in Ardoin v. Firestone Polymers, L.L.C., 10-0245 (La.1/19/11), 56 So.3d 215. The employee, Mr. Ardoin, claimed that the unwitnessed accident occurred when he almost fell off his bike, threw down his right leg, and twisted his knee. In finding the first Bruno factor was not satisfied, the Supreme Court summarized the evidence discrediting or casting serious doubt on the employee’s account as follows:
[H]is initial denial of an accident; his long delay in reporting the claimed work-related injury [eighteen months] even waiting until after Dr. Hinton diagnosed a twisting injury; his inconsistent accounts of why he delayed reporting the accident (fear of repercussions versus forgetting as a result of pain); and his admission well over a year after the claimed accidental injury that he was not sure of the cause of his knee pain.
Ardoin, 10-0245 at p. 13, 56 So.3d at 223. The Supreme Court thus held that the Workers’ Compensation Judge erred in finding, and the appellate court in | ai affirming that factual finding, that the employee (Mr. Ardoin) sustained an unwit-nessed work-related accident in which he injured his knee.
Contrary to the City’s contention, in this case, unlike in the Ardoin case, there is no evidence discrediting or casting serious doubt on the employee’s version of the *555 accident. The City presented no evidence contradicting Mr. Marti’s version of a work-related accident at the NOPD Evidence Building. Moreover, his version of the accident was plausible given his job duties coupled with Ms. Smith’s admission that she sent him on numerous similar job assignments. The first Bruno factor therefore was satisfied.
The pertinent considerations in determining whether the second Bruno factor— corroboration of the worker’s testimony— is satisfied have been identified as including the following five factors: late report, supervisor and co-worker testimony, medical evidence, prior injuries, and another accident as source. 1 Denis Paul Juge, LOUISIANA WORKERS’ COMPENSATION § 8:1 (2d ed.).[8] In reviewing the OWC Judge’s implicit factual finding that Mr. Marti met the second Bruno factor, we subdivide our analysis based on these five factors and add a sixth factor — the employee’s credibility at trial.
Late Report
The first factor is whether the employee filed, or failed to file, a prompt accident report. Mr. Marti testified that he verbally reported the accident on the day |22it occurred to his supervisor, Ms. Smith. Conversely, Ms. Smith testified that she did not recall Mr. Marti reporting either the accident or any job-related injury. The OWC Judge resolved this factual dispute in Mr. Marti’s favor noting the following points in her reasons for judgment:
• Mr. Marti reported the accident per the City’s policy to his supervisor, Pamela Simms [Smith], Mr. Marti made the report to Ms. Simms within a few days of the accident.
• Mr. Marti called in sick on Friday due to his leg pain. No evidence contradicted this testimony. While the City’s records don’t show why Mr. Marti called in sick, they do corroborate that he did take sick leave.
• Mr. Marti took leave pursuant to the [FMLA] for the injuries to his leg. Athough Ms. Simms did not recall Mr. Marti reporting the accident or whether or not she prepared an accident report, Ms. Simms recalled that Mr. Marti did take FMLA for a “serious medical reason”. Mr. Marti turned his FMLA form in to Ms. Simms.[9]
*556 • Ms. Simms did not deny that Mr. Mar-ti had an accident or that he reported it. She simply could not remember that he did. Ms. Simms candidly admitted that with her heavy workload some things probably fell through the cracks. Based on the evidence, Mr. Marti’s accident report was one of them.
Supervisor and co-worker testimony
“[Tjestimony by family and friends to the effect that the claimant related the event to them soon afterwards, in substantially the same manner that he now recounts it, is corroborative.” H. Alston Johnson, III, 13 LA. CIV. L. TREATISE, WORKERS’ COMPENSATION LAW AND PRACTICE § 253 (5th ed). At trial, both Mr. Marti’s wife and his co-worker testified that he related the event to them | a-jSoon afterwards — on the date it occurred — in substantially the same manner that he now recounts it — he twisted his knee coming down a ladder. Summarizing their corroborating testimony, the OWC Judge noted in her reasons for judgment that “[Mr. Burkhardt] recalled seeing Mr. Marti limping and asked what had happened. Mr. Burkhardt testified that Mr. Marti told him that Mr. Marti had stepped off of a ladder and had hurt himself.” The OWC Judge further noted that “[w]hen Mr. Marti returned from work to his home on the day of the accident, Sandra Marti, Claimant’s wife, saw he was in pain. Mrs. Marti testified that Mr. Marti told her that evening about the ladder and the accident in the NOPD evidence building.”
Medical evidence
“One of the most important factors considered by the courts is whether the early medical records support the history of a job accident.” LOUISIANA WORKERS’ COMPENSATION § 8:1. Finding the medical records introduced corroborated Mr. Marti’s version of the accident, the OWC Judge stated in her reasons for judgment that “on June 16, 2008, shortly before Mr. Marti began working for the City, he underwent a physical at Concen-tra Medical Centers. This exam showed that Mr. Marti’s knee condition, range of motion and reflexes were within normal limits and that he had no medical restrictions.” The OWC Judge thus noted that although Mr. Marti had a prior history of knee problems, Concentra, based on that pre-employment physical, found that “his knee was within normal limits and that he was fit for duty.” The OWC Judge further noted that “this changed after the accident” and that “[s]hortly after this fall,[10] Mr. Marti went to Dr. Samuels for care, and there was objective evidence that Mr. Marti’s knee had fluid on it and had gotten worse than it had been.”
| ¡.¿Prior injuries
The next factor is a prior, similar injury. “The fact that an employee has previously had an injury similar to the one that is alleged to have occurred at work is generally irrelevant in a workers’ compensation claim as the employer ‘takes his employee as he finds him.’ ” LOUISIANA WORKERS’ COMPENSATION § 8:1. This factor, however, becomes relevant “if the employee denies that he ever had such injury or denies that the prior injury was still causing him problems prior to his ‘accident’ at work and this denial is contradicted by the evidence at trial.” Id. Conversely, the jurisprudence has recognized as a corroborating factor the fact that an employee with a prior injury had been working at his job for some time before the accident without problems. See Blair *557 v. Wal-Mart Stores, Inc., 01-2211, p. 10 (La.App. 4 Cir. 5/15/02), 818 So.2d 1042, 1049 (noting the fact that “Ms. Blair had been working at Wal-Mart for about ten months before the accident occurred without any problems” supported Ms. Blair’s contention that her prior injury had resolved itself before the accident). In this case, the record reflects that despite his preexisting knee problems Mr. Marti had been working at his job with the City for approximately two years before the ladder incident without any problems.
Another accident as source
This factor is inapplicable. The record does not reflect any other accident as a possible source of Mr. Marti’s re-injury of his knee.
Employee’s credibility at trial
As a noted commentator has stated, “[wjhere the testimony or corroborative circumstances are inconclusive or inconsistent, the plaintiffs credibility may determine the outcome.” LOUISIANA WORKERS’ COMPENSATION § 8:1. Such is the case here. The OWC Judge in her reasons for judgment expressly lasfound that Mr. Marti was “very credible at trial.” In so finding, the OWC Judge cited Ms. Smith’s testimony that Mr. Marti “was a good employee, who was honest.”
Based on the above analysis, we conclude that the OWC Judge’s finding that Mr. Marti met his burden of establishing an unwitnessed, work-related accident— the implicit finding that both Bruno factors were satisfied — is not manifestly erroneous. In so finding, we acknowledge that there are some factors that could be considered inconsistent with a work-related accident. See Sheppard v. Isle of Capri, 40,048, p. 8 (La.App. 2 Cir. 8/17/05), 909 So.2d 699, 704 (noting the fact employee initially sought leave under FMLA to be inconsistent with a work-related injury). As the City contends, the medical evidence corroborating the accident is scant. The first reference in the medical records to a work-related injury or trauma is Dr. Kep-pel’s March 25, 2011 chart note. However, the medical evidence is only one of the multiple factors to be considered in determining if the employee’s testimony is corroborated.
As noted earlier, the City failed to offer any evidence to discredit or cast serious doubt on Mr. Marti’s version of the accident at the NOPD Evidence Building. Given that the OWC Judge’s finding of a work-related accident is reasonable in light of the record in its entirety, we cannot find manifest error. The City’s contention that Mr. Marti failed to establish a work-related accident is unpersuasive.[11]

(ii) causation of aggravation of a preexisting condition

lsfiThe City next contends that even assuming, arguendo, a work-related accident was established, the medical evidence is insufficient to satisfy Mr. Marti’s burden of proving the accident caused a compen-sable injury or disability. The City points out that if the probability of causation is equally balanced on the evidence presented, the employee has failed to carry his burden of proof. The City further points out that neither of Mr. Marti’s treating physicians for his knee injury — neither Dr. Keppel nor Dr. Samuels — offered any sup *558 port for the proposition that Mr. Marti’s aggravation of his knee condition was the result of a work-related accident. The best Mr. Marti’s physicians could opine was that it was “possible” he experienced an aggravation to his preexisting knee condition. The City thus contends that the evidence is insufficient to establish an injury resulting in a subsequent disability occurred. The City contends that this is true not only for the knee injury, but also for the shoulder injury.
Although we agree with the City’s contention that Mr. Marti failed to establish that the accident caused the shoulder injury, we disagree with its contention as to the knee injury. We find no error in the OWC’s Judge’s finding that Mr. Marti established that he suffered a compensable knee injury but not a compensable shoulder injury. We separately address each injury below.
The shoulder injury
For ease of discussion, we first address Mr. Marti’s contention that the OWC Judge erred in failing to find his shoulder injury was caused by the compen-sable knee injury. As noted elsewhere, Mr. Marti alleges that as a result of his work-related, left knee injury, his left knee gave way causing him to fall at home and to re-injure his right shoulder. Rejecting Mr. Marti’s contention that as a result of his 127Compensable knee injury — a knee-related fall — he suffered an aggravation of a preexisting shoulder injury, the OWC Judge in her reasons for judgment stated:
On March 22, 2010, Mr. Marti reported pain in his right shoulder to Dr. Keppel. Mr. Marti had been experiencing right shoulder pain for at least twenty years with an increase since March 2009. Upon exam, Dr. Keppel found “a painful range of motion of the right shoulder with weak abduction, or bringing away of the shoulder from the body, and some crepitus on range of motion.” Dr. Keppel ordered an MRI.
Mr. Marti had the MRI. One week later, he fell, and he reported that his right shoulder pain had increased after the fall. Dr. Keppel felt that Mr. Mar-ti’s exam was no different than before the fall. The MRI revealed a rotator cuff tear. Mr. Marti’s increased shoulder pain predated this accident. He complained to Dr. Keppel in March 2010 that his shoulder had been more painful for approximately one year, which is March 2009. Mr. Marti’s work-related accident happened several months later. Further, the MRI revealing the rotator cuff tear was performed before Mr. Marti’s fall at home. Thus, the evidence demonstrates that his rotator cuff tear was not related to his workplace accident nor does the evidence demonstrate that there was a knee-related fall that caused, aggravated, or accelerated the preexisting shoulder problems.
We find no manifest error in the OWC Judge’s factual finding that the subsequent shoulder injury was not a compensable injury.
The knee injury
Unlike the shoulder injury, the OWC Judge found that Mr. Marti’s met his burden of proving that the aggravation of his preexisting knee injury was caused by the work-related accident. In so finding, the OWC Judge summarized the pertinent jurisprudence regarding an employee’s proof of causation of a disability resulting from aggravation of a preexisting condition as follows:
• Citing Buxton v. Iowa Police Dep’t, 09-0520, pp. 11-12 (La.10/20/09), 23 So.3d 275, 283, the OWC Judge noted that “[t]he chain of causation required by the statutory scheme [La. R.S. 23:1031] is that the employment causes *559 the accident, the accident causes injury, and the injury causes disability. The employee has the burden of proving, by a preponderance of the evidence, that the resulting disability is related to an on-the-job injury.”
|⅞* Citing Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689, the OWC Judge further noted that “[e]ven if the claimant suffered from a preexisting medical condition, he may still meet his burden of proof of causation if he proves that the accident aggravated, accelerated, or combined with the preexisting condition to produce an injury resulting in a compensable disability.”
• The OWC Judge still further noted that the employee, in meeting his burden, may be aided by a presumption of causation.
Summarized, the presumption of causation is as follows:
A preexisting condition is presumed in workers’ compensation matter to have been aggravated by work-related accident if the employee proves: (1) the disabling symptoms did not exist before the accident; (2) commencing with the accident, the disabling symptoms appeared and manifested themselves thereafter; and (3) either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and the activation of the disabling condition.
Eldon E. Fallon, LA. PRAC. TRIAL HANDBOOK FOR LA. LAWYERS § 21:19 (3d ed.).
The OWC Judge in her reasons for judgment implicitly found all the requirements for invoking the presumption of causation were satisfied. First, the disabling symptom — aggravation of the preexisting left knee injury — was found not to exist before the work-related accident. The OWC Judge noted that Mr. Marti’s June 2008 Concentra pre-employment physical revealed that he had no medical restrictions relating to his knee. Second, the OWC Judge found that the disabling symptoms commenced with the work-related accident. Explaining this finding, the OWC Judge stated in her reasons for judgment the following:
After the subject work accident, in August 2009, Dr. Samuels examined Mr. Marti. Dr. Samuels felt that there were objective changes in Mr. Marti’s knee. An ultrasound showed fluid. Based on the ultrasound results, Dr. Samuels opined that there was “indication that things had gotten worse.” Dr. Samuels focus was on treating Mr. Marti’s symptoms, not on the mechanism of how Mr. Marti came to have the symptoms. Dr. Samuels could not say one way or the other whether the fluid was a result of trauma or not because Mr. Marti did |2anot report the ladder incident to him. However, Dr. Samuels felt that the mechanism of the described accident could have aggravated Mr. Marti’s preexisting knee condition.
Likewise, the OWC Judge noted that Dr. Keppel “felt that it was possible that this accident aggravated Mr. Marti’s condition.”
Third, the OWC Judge found that the medical evidence established a reasonable possibility of a causal connection between the work-related accident and the commencement of the disabling condition. In support of this finding, the OWC Judge cited the testimony of Dr. Keppel that the work-related accident possibly caused an aggravation of Mr. Marti’s preexisting left knee injury. Dr. Keppel testified that the ladder incident “may have aggravated his condition which was in the left knee” and that it was possible that this ladder incident aggravated Mr. Marti’s preexisting left knee injury.
*560 Based on our review of the record, we find, contrary to the City’s contention, the OWC Judge was not manifestly erroneous in finding the work-related accident caused an aggravation to Mr. Marti’s preexisting left knee injury.

(iii) entitlement to TTD

The City’s next argument is that the OWC Judge erred in awarding Mr. Marti TTD -in the amount of $6,474.00 from February 25, 2010 (the date of the knee surgery) through May 18, 2010 (the day before the shoulder surgery and the end of the FMLA leave) at maximum rate of $546. The City points out that La. R.S. 22:1221 provides that TTD can be awarded only if the employee proves by “clear and convincing evidence that [he] is physically unable to engage in any employment as a result of a work-related injury.” The City further points out that Mr. Marti quit working in February 2010 following his knee surgery. According to | sothe City, no medical evidence was presented to support the position that the knee surgery was necessitated by any work-related injury.
The City still further points out that Mr. Marti, in completing the paperwork for the Hartford disability claim, enumerated multiple causes of his disability of which the knee injury was only one. The City emphasizes that neither of Mr. Marti’s treating physicians for his knee injury could say that Mr. Marti’s knee injury was aggravated by a work-related accident. Rather, Dr. Samuels testified that he could “not say one way or the other” whether any increase in left knee symptoms that Mr. Marti presented with in August 2009 were due to trauma as opposed to the natural progression of the preexisting knee problems he observed in February 2009. Dr. Keppel opined that when he operated on the left knee in February 2010 he observed a loose body in the knee joint that was the result of arthritis and extensive degeneration of the medial meniscus. Dr. Keppel testified that a trauma “could” aggravate such a condition. Given the absence of clear and convincing evidence that Mr. Marti’s inability to work was due to a work-related incident, the City contends that the OWC Judge erred in awarding Mr. Marti TTD.
An employee seeking TTD has the burden of proving by clear and convincing evidence that he is unable to engage in any type of employment. Reinhardt v. City of New Orleans, 09-1116, p. 26 (La.App. 4 Cir. 1/13/10), 30 So.3d 229, 244. This court has held that an employee seeking TTD benefits must introduce objective medical evidence to sustain his claim by clear and convincing evidence. Bilquist v. Custom Craft Homes, Inc., 12-0469, pp. 13-14 (La.App. 4 Cir. 11/7/12), 105 So.3d 194, 203 (citing Jackson v. Sysco Food Services, 05-1304, pp. 1-2 (La.App. 4 Cir. 6/7/06), 934 So.2d 191, 193); see also Blair, 01-2211 at pp. 7-17, 818 So.2d at 1047-53. In determining whether an employee has |simet his burden of proving by clear and convincing evidence his entitlement to TTD benefits, the OWC Judge must weigh both medical and lay evidence. Bilquist, 12-0469 at p. 14, 105 So.3d at 203.
In finding Mr. Marti was entitled to TTD, the OWC Judge reasoned as follows:
The last day Mr. Marti worked was February 21 or 24, 2010. In January 2010, Mr. Marti had requested FMLA leave to commence on February 25, 2010, due to his medical condition and knee surgery, as evidenced by Dr. Kep-pel’s note and the FMLA form. Mr. Marti’s FMLA leave concluded on May 19, 2010. By letter dated April 21, 2010, the City advised Mr. Marti that if he were unavailable to return, to work on May 20, 2010, he would be terminated. *561 On June 4, 2010, when Mr. Marti did not return to work, the City terminated Mr. Marti, citing as their reasons that Mr. Marti was “unable or unwilling to perform the duties of [his] ... position”. The City noted that it was aware of Mr. Marti’s ongoing need for medical care and additional time off related to the resulting temporary inability to work. The Separation notice stated as the cause of termination, “Not Physically Able to Work.”
When Mr. Marti became disabled as a result of the workplace accident, he used his sick leave and annual leave. Mr. Marti exhausted his sick and annual leave reserves with the City on March 24, 2010. These were paid at his full rate of pay, not the reduced workers’ compensation rate. On March 25, 2010, Mr. Marti was still on approved leave through the FMLA, but this leave was “leave without pay”, an uncompensated form of leave. On July 19, 2010, Mr. Marti filed this 1008 because he was not receiving workers’ compensation benefits. Therefore, he has made his intention to receive workers’ compensation indemnity benefits clear. The City is obligated to pay Mr. Marti workers’ compensation indemnity benefits at the maximum rate of $549.00 weekly for the periods of disability related to his knee. Accordingly, employer is obligated to pay TTD benefits from February 25, 2010, until Mr. Marti’s total disability from the injuries attributable to the workplace accident ceased on May 18, 2010.
The OWC Judge in her reasons for judgment identified at least two sources of support for her finding that Mr. Marti met his burden of proving by clear and convincing evidence his entitlement to TTD— Dr. Keppel’s note and the FMLA Inform. Dr. Keppel’s note documents Mr. Marti’s inability to return to work while recovering from the knee surgery. The FMLA form, which Dr. Keppel completed for Mr. Marti on January 19, 2010, states that the patient’s condition involves a “serious health condition” as defined under the FMLA. It describes the medical facts as left knee pain, severe arthritis, and a loose body. It states that the employee will be required to take off of work because of surgery scheduled on February 25, 2010, and that patient will need up to three months to recover. It further states that patient “may be at no duty till after recovery from surgery or light duty.” It states that patient will be absent from work until release after surgery.
In awarding TTD, the OWC Judge narrowly cabined the period for which such benefits were awarded to the period during which Mr. Marti was on FMLA leave convalescing from the February 2010 knee surgery. Contrary to the City’s contention, we find no error in the TTD award of $6,474.00.

(iv) reimbursement of medical expenses

The governing statute is La. R.S. 23:1208, which provides that “the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment.” An injured employee claiming medical expenses under the LWCA must prove by specific evidence that his claim is related to his work-related injury. Montana v. City of New Orleans, 95-1701, p. 9 (La.App. 4 Cir. 6/5/96), 682 So.2d 239, 245 (citing Schulz v. Board of Com’rs of Port of New Orleans, 614 So.2d 135, 137 (La.App. 4th Cir.1993)). The employee’s burden of proof is by a preponderance of the evidence. Id. “Un-particularized evidence from which it may be inferred that the employee received medical treatment does not | .^constitute *562 evidence of the nature, cost and necessity of the medical services.” Montana, 95-1701 at p. 9, 682 So.2d at 245 (citing Schulz, 614 So.2d at 138).
In this case, the OWC Judge awarded Mr. Marti medical expenses associated with the re-injury of his left knee. In so doing, the OWC failed to award a specific sum of medical expenses; instead, the OWC’s judgment lists four categories of covered expenses — (1) Dr. Samuels, (2) Dr. Keppel, (3) Dr. Devraj,[12] and (4) prescription medication necessary and related to treatment of his left knee injuries[13] — and includes the same footnote following each of the four categories of expenses. The footnote reads:
“The court can not [sic] calculate the value of this claim because Claimant did not provide medical bills expressly identifying the charges of this provider for treatment to Mr. Marti’s left knee.”
The City contends that the OWC erred in awarding reimbursement for medical expenses that were not properly quantified or identified with specificity as being causally related to any specific accident or injury. The City argues that Mr. Marti never put into evidence exactly which charges were incurred for his specific work-related condition. The City’s argument has merit.
The Code of Civil Procedure defines a judgment as “the determination of the rights of the parties in an action and may award any relief to which the parties are entitled.” La. C.C.P. art. 1841. The OWC’s judgment is legally deficient in that it fails to award a specific sum for medical expense related to the knee injury; “[t]he employer is unable to ascertain which bills the court has awarded as reasonable, necessary and work-related.” Oxley v. Sattler, 97-1299 (La.App. 3 Cir. 2/18/98), 710 So.2d 261, 266 (citing La. C.C.P. art. 1841). For these reasons, we reverse the unspecific award of medical expenses for the knee injury and remand to the OWC for the limited purpose of taking additional evidence, if necessary, for the purpose of determining and awarding a specific sum of medical expenses for the knee injury.

(iv) imposition of penalties and attorneys’fees

Mr. Marti contends that the OWC erred in failing to award him penalties and attorneys’ fees. Citing Coscino v. Louisiana State Boxing and Wrestling Comm’n, 97-2733 (La.App. 4 Cir. 9/9/98), 718 So.2d 1016, the OWC found that Mr. Marti was not entitled to such an award because he failed to plead the same. We agree.
“When items of special damage are claimed, they shall be specifically alleged.” La. C.C.P. art. 861. Penalties and attorneys’ fees are items of special damages, within the meaning of La. C.C.P. art. 861, that must be specifically alleged. See Box v. City of Baton Rouge, 02-0198 (La.App. 1 Cir. 1/15/03), 846 So.2d 13 (citing Coscino, 97-2733 at p. 6, 718 So.2d at 1020).
This case is factually distinguishable from Haynes v. Lee White Wrecker Service, 612 So.2d 944 (La.App. 4th Cir.1993), in which this court held that a pro se *563 claimant was entitled to an award of penalties and attorneys’ fees despite the claimant’s failure to include a request for such an award in his petition. In so finding, this court reasoned that the claimant completed, without assistance from counsel, a state-drafted form petition that did not provide a section or an opportunity to .request penalties and attorneys’ fees. Continuing, we reasoned that “[t]he plaintiff, who filled out this form himself, and who is not a lawyer should not be penalized for not specifically requesting this type of award.” Haynes, 612 So.2d at 948. We further noted that in a writing attached to the petition, the |35claimant stated in his own words facts that supported an award of penalties and attorneys’ fees penalties.
Unlike the claimant in Haynes, Mr. Marti was represented by an attorney, yet failed to request an award of penalties and attorneys’ fees in his disputed claim form. Nor did he request leave of court to amend his petition to request such an award. At the beginning of the trial in this matter, the City informed the OWC Judge of Mr. Marti’s failure to allege that he was entitled to an award of penalties and attorneys’ fees in his disputed claim form. In response to the OWC Judge’s questioning of whether this was correct, Mr. Marti’s counsel replied: “I think that penalties are alleged.” The record, however, does not support that representation.
On appeal, Mr. Marti argues that regardless “whether he pled them in his 1008 form,” he is entitled to penalties and attorneys’ fees. This argument is unpersuasive. Mr. Marti failed to request an award of penalties and attorneys’ fees; thus, the issue was not properly presented to the OWC. We decline to consider the issue for the first time on appeal.[14]

(v) jurisdiction over claim for reimbursement of insurance premiums

The final issue is Mr. Marti’s contention that the OWC erred in rejecting his claim for reimbursement of the escalated health insurance premiums he incurred after being terminated by the City (COBRA payments). The OWC found that it lacked subject matter jurisdiction to decide Mr. Marti’s claim for reimbursement of insurance premiums.
lüfiUnder the Louisiana Constitution, district courts are vested with jurisdiction over all civil and criminal matters “[e]xcept as otherwise authorized by [the constitution] or except as heretofore or hereafter provided by law for administrative agency determinations in worker’s compensation matters.” La. Const, art. V, § 16(A)(1). Pursuant to La. R.S. 23:1310.3, the OWC is vested with jurisdiction only for “claims or disputes arising out of’ the LWCA.[15] The City points out that the LWCA does not provide an employee with a right to reimbursement of health insurance premiums paid to a current or former employer. The City thus contends the OWC correctly concluded it lacked subject matter jurisdiction. We agree.
The jurisprudence has held that “[i]f an issue arises out of the Workers’ *564 Compensation Act, jurisdiction is vested in the OWC; however, if it merely relates to the compensation claim, the OWC does not have subject matter jurisdiction.” Ryan v. Blount Bros. Constr. Inc., 40,845, p. 5 (La.App. 2 Cir. 4/19/06), 927 So.2d 1242, 1247; see also DeMarco v. David Briggs Enterprises, Inc., 09-0615, p. 5, n. 6 (La.App. 4 Cir. 1/13/10), 30 So.3d 246, 249. The mere involvement of a workers’ compensation issue is insufficient to subject the entire matter to the OWC’s jurisdiction. TIG Ins. Co. v. Louisiana Workers’ Compensation Corp., 04-2608, p. 4 (La.App. 1 Cir. 6/10/05), 917 So.2d 26, 28. Nor is the judicially efficiency of adjudicating a related demand in the same forum as the main demand sufficient to subject the entire matter to the OWC’s jurisdiction. James v. Nationwide Restoration, LLC, 11-307, pp. 4-5 (La.App. 5 Cir. 12/13/11), 81 So.3d 887, 889; Broussard Physical Therapy v. Family Dollar Stores, Inc., 08-1013 (La.12/2/08), 5 So.3d 812 (OWC does not have subject matter jurisdiction to decide defense and indemnification claim filed by an employer and a workers’ compensation insurer against a PPO).
Based on these principles, we find no error in the OWC’s determination that it lacked subject matter jurisdiction to decide Mr. Marti’s claim for reimbursement of insurance premiums.

DECREE

For the forgoing reasons, the judgment of the Office of Workers’ Compensation is reversed insofar as it awards an unspecified amount of medical expenses for the knee injury. In all other respects, the judgment of the Office of Workers’ Compensation is affirmed. This matter is remanded for the limited purpose of taking additional evidence, if necessary, in order to determine and to award a specific sum of medical expenses for the knee injury. Costs of this appeal are divided equally between the parties.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

. The exact date of the accident is unclear. In his disputed claim form (Form 1008), Mr. Marti alleged that the date of the accident was between July 26 and August 10, 2009. At trial, Mr. Marti's counsel, in response to the OWC Judge's question, represented that the accident occurred between July 10 and August 20, 2009. Mr. Marti testified the accident occurred in the end of July or the beginning of August 2009.

. In his deposition, Mr. Marti testified that he did not report the accident the same day because it was getting close to the weekend so he wanted to see if his leg would heal. He thus reported that he was sick that day and waited until Monday to tell Ms. Smith what occurred. He testified that her response was that he should have told her the day it occurred and that she told him that she should write him up for failure to do so.

. Mr. Marti sustained a right knee injury while working for the Fire Department, which resulted in him being on disability.

. There is a discrepancy between the judgment and reasons for judgment as to the maximum TTD rate. The judgment states the rate as $546; whereas, the reasons for judgment state it as $549. The judgment, which also states the total amount awarded, is controlling. We further note that the parties stipulated that the maximum TTD rate applicable in this case is $546.

. On appeal, the City asserts the following four assignments of error:
1. The OWC erred in finding the occurrence of an accident.
2. The OWC erred in finding a disability resulting from the occurrence of a work-related accident in regards to the left knee.
3. The OWC erred in granting indemnity and medical benefits
4. The OWC erred in awarding reimbursement for medical expenses not properly quantified or identified with specificity as being causally related to any accident and injury.

. Mr. Marti asserted the following four assignments of error:
1. The OWC erred in finding that the Claimant did not carry his burden of proof to the Claimant’s shoulder accident and injury.
2. The OWC erred in denying the Claimant medical and indemnity benefits for his knee accident and his shoulder accident.
3. The OWC erred in not awarding the Claimant attorneys' fees, penalties, and costs.
4. The OWC erred in rejecting Claimant's claim for financial reimbursement of the portion of escalated insurance premiums payments incurred post Claimant termination.

. Another commentator enumerates the factors for determining whether the second Bruno factor of corroboration is met as follows: “(1) testimony by spouse, coworkers or friends to the effect that the claimant related the event to them soon afterwards, in substantially the same manner that he now recounts it, is corroborative but contradictory testimony on this point may be damaging; (2) medical testimony consistent with the claimant’s version or in fact inconsistent with it; (3) filing of a prompt accident report, or the lack of it; (4) continuation of work thereafter, or the lack of it; (5) past medical history and some others.” H. Alston Johnson, III, 13 LA. CIV. L. TREATISE, WORKERS’ COMPENSATION LAW AND Practice § 253 (5th ed). These factors are simply another way of articulating the test articulated in 1 Denis Paul Juge, LOUISIANA WORKERS’ COMPENSATION § 8:1 (2d ed.). See LaFrance v. Weiser Security Service, Inc., 01-1578, p. 15, n. 11 (La.App. 4 Cir. 3/27/02), 815 So.2d 339, 349 (noting these two tests are simply two different ways of articulating the test for determining whether the employee established by a preponderance of the evidence an unwit-nessed, work-related accident).

. The OWC Judge further noted:
The FMLA form was dated January 19, 2010, and signed by Dr. Keppel. It clearly stated as the reason for leave, "A serious health condition that makes you unable to perform the essential functions for your job ...". The description of the serious condition was “L knee pain, severe arthritis with (sic) Loose body.” There were restrictions from work because Mr. Marti was to have "surgery on Feb. 25th. PT [patient] will need to recover.”. The duration was "till Release from Dr. Keppel may be up to 3 mnts [(months)].” Dr. Keppel noted "pt *556 may be at no duty till after Recovery from surgery or light duty.”

. As noted elsewhere, it is undisputed that Mr. Marti did not fall off the ladder.

. Mr. Marti does not allege that the subsequent shoulder injury he sustained in March 2010 was the result of a separate work-related accident. Rather, he contends that his weakened left knee caused him to fall and to aggravate his preexisting shoulder injury. He thus contends that the shoulder re-injury was caused by the compensable injury to his knee. We thus address the shoulder injury in the next section of this opinion regarding causation.

.. The record contains no evidence that Dr. Devraj treated Mr. Marti for the left knee injury resulting from the ladder accident. Rather, the record indicates that Dr. Devraj treated Mr. Marti for his shoulder injury.

. The OWC Judge noted at the end of the trial that there was some evidence the City paid for some medications for Mr. Marti through a "medication card.” The record, however, does not reflect the extent, if any, the City paid for Mr. Marti's prescription drugs related to the left knee injury. Regardless, the parties stipulated at the beginning of trial that the City had paid none of Mr. Mar-ti's medical expenses.

. Although Mr. Marti also included in this assignment of error a contention that the OWC erred in failing to award costs, this issue was not presented at trial. We decline to consider it for the first time on appeal. Nonetheless, in our decree, we order that the costs of this appeal be divided equally between the parties. See La. C.C.P. Art. 2164 (providing that an appellate court may tax the costs of appeal "against any party to the suit, as in its judgment may be considered equitable.”)

. La R.S. 23:1310.3 provides that "the workers’ compensation judge shall be vested with original, exclusive jurisdiction over all claims or disputes arising out of this Chapter.”